REDACTED

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



Docket and File

**SENTENCING MEMORANDUM**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 09 Cr. 1082 (RMB) |
| CAMERON DOUGLAS, | : | |
| Defendant. | : | |

U.S. DISTRICT COURT
FILED
APR **6** 2010
S.D. OF N.Y.

### SENTENCING MEMORANDUM ON BEHALF OF CAMERON DOUGLAS

LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue, 33rd Floor
New York, New York 10110-3398
(212) 921-8399

DE FEIS O'CONNELL & ROSE, P.C.
500 Fifth Avenue, 26th Floor
New York, New York 10110-3398

*Counsel for Cameron Douglas*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

    I.   CAMERON DOUGLAS ............................................................................ 3

    II.  CAMERON DOUGLAS'S PERSONAL HISTORY ............................................ 5

    III. CAMERON'S OFFENSE CONDUCT ........................................................... 10

        A.   Cameron's Participation in A Conspiracy to Distribute Crystal Meth and Cocaine, While Serious, Was Not Long Lasting .................................................... 10

██████████████████████████████████
████████████████████████

██████████████████████████████████
████████████████████████████████

██████████████████████████████████
██████████████████████████

ARGUMENT ..................................................................................................... 19

POINT ONE

███████████████████████████████████
████████████████████████

█████████████████████████████████
██████████████████████████████████

███████████████████████████████████
███████████████████

POINT TWO

███████████████████████████████████
█████████████████████████████████

██████████████████████████████████
████████████████████████████████

██████████████████████████████████
████████████████████████████████

POINT THREE
    The Section 3553(a) Factors Militate In Favor Of A Substantial Variance From The
    Guidelines ................................................................................................................. 38

        *The Nature And Circumstances Of The Offense And The History And Characteristics Of*
        *The Defendant — 18 U.S.C. § 3553(a)(1)* ......................................................... 38

        *The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense, To*
        *Promote Respect For The Law, And To Promote Just Punishment For The Offense —*
        *18 U.S.C. § 3553(a)(2)(A)* ................................................................................ 40

        *The Need For The Sentence Imposed To Afford Adequate Deterrence To Criminal*
        *Conduct — 18 U.S.C. § 3553(a)(2)(B)* ............................................................. 42

        *The Need For The Sentence Imposed To Protect The Public From Further Crimes Of The*
        *Defendant — 18 U.S.C. § 3553(a)(2)(C)* ......................................................... 44

CONCLUSION ..................................................................................................... 45

## TABLE OF AUTHORITIES

**CASES**                                                      **PAGE(S)**

*Collado v. United States,*
2008 U.S. Dist. LEXIS 44010 (S.D.N.Y. June 5, 2008) ........................................ 31

███████████████████████████████████████████

*Kimbrough v. United States,*
552 U.S. 85 (2007) ...................................................................................... 19, 20

*Koon v. United States,*
518 U.S. 81 (1996) ............................................................................................ 19

*United States v. Arreaga,*
2006 WL 278156 (S.D.N.Y. Feb. 2, 2006) ........................................................ 43

*United States v. Behr,*
2006 WL 1586563 (S.D.N.Y. June 9, 2006) ...................................................... 42

███████████████████████████████████████████

*United States v. Booker,*
543 U.S. 220 (2005) .................................................................................... 19, 33

*United States v. Collado,*
2008 WL 2329275 (S.D.N.Y. June 5, 2008) .................................................. 36, 37

*United States v. Collins,*
2007 WL 1723718 (S.D.N.Y. June 7, 2007) ...................................................... 35

███████████████████████████████████████████

███████████████████████████████████████████

*United States v. Hernandez,*
2006 WL 870933 (S.D.N.Y. Apr. 5, 2006) ........................................................ 43

*United States v. Lian,*
2007 WL 1187980 (S.D.N.Y. Apr. 20, 2007) .................................................... 42

*United States v. Maier,*
975 F.2d 944 (2d Cir. 1992) ........................................................................ 29, 30

*United States v. Rivera,*
    2006 WL 1596814 (S.D.N.Y. June 9, 2006) ........................................................... 35

*United States v. Williams,*
    65 F.3d 301 (2d Cir. 1995) ........................................................... 29, 33, 34

**RULES**

18 U.S.C. § 3553(a) ........................................................... passim

21 U.S.C. § 841(b)(1)(A) ........................................................... 33, 34, 36

28 C.F.R. § 550.53 ........................................................... 32

## PRELIMINARY STATEMENT

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

███████████████

Should the Court believe that a term of imprisonment with treatment in a Bureau of Prisons program is warranted, we believe that due to BOP rules a sentence of approximately 42 months would ensure his timely entry into such a program.

We further suggest that the terms of supervised release provide for Cameron's continued treatment, monitoring and his involvement in educating others about drug abuse.

## INTRODUCTION

Cameron Douglas has been plagued by a serious drug problem since adolescence. ██████████████████████████████████

██████████████████  ██████████████████████

████████████████████████████████████████

███████████████████████████ Despite these obstacles, as the letters

──────────────────────

[1] █████████████████████████████████████████
██████████████████████████████████████

1

annexed to this submission reflect, Cameron is a sensitive, caring and talented young man, who —

but for his addiction to drugs -- has tremendous potential in the music field, as an actor, and in

other endeavors.  Unfortunately, drugs came to dominate his life, depriving him of one

opportunity after another, ███████████████████████████████████

██████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████████████

2

█████████████████████████████████████████████

████████████████████████ He has been sober for the longest stretch of time

since adolescence, ██████████████████████████████████████████

████████ For the first time in many years, he feels the warmth of a loving and supportive family,

fully committed to his rehabilitation.  Recovery is close within his grasp.

We appreciate the sensitivity and insight the Court has demonstrated regarding

drug treatment.  We urge the Court to ████████████████████████████████

███████████████████████████████████████████████

████████ impose a sentence that will provide Cameron the treatment that he needs immediately

and -- through conditions of supervised release -- ensure his present sobriety into the indefinite

future.

## STATEMENT OF FACTS

## I.   CAMERON DOUGLAS

Over two dozen people have submitted letters to the Court in support of Cameron

Douglas.  The letters come from a diverse array of people, representing most aspects of

Cameron's life.  His mother, father, stepmother, grandparents, caretakers, family and childhood

friends have each taken the time and care to inform the Court about Cameron and ask Your

Honor for leniency and compassion at his sentencing.  These letters describe Cameron as

generous, thoughtful, and kind; someone who has "a good heart . . . a very good heart"; and,

importantly, █████████████████████████████████████████

████████████████████████ The letters are a testament to the support system

that will surround Cameron as he sheds his drug-addled past and starts a new, sober life.  *Id.*

---

2 ████████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████  It says much about

Cameron's disposition that he is known to his family and friends as one who identifies with --

and gravitates towards -- the "underdog," even though his privileged upbringing as the son and

grandson of two of Hollywood's most renowned actors meant that he need not concern himself

with the plight of others.  Eschardies Letter, Ex. 9 at 1-2; Joel Douglas Letter, Ex. 8; Michael

Douglas Letter, Ex. 27 at 3; Zack Bacon Letter, Ex. 4 at 2; Kimmel Letter, Ex. 18 at 1.

         In fact, the letters' overarching theme is that Cameron has spent much of his life

in search of a loving, close-knit family.  ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████

---

[3] The paragraph citations to the PSR are based on a draft provided to us by the Probation Office, and may not precisely correspond to those in the final PSR.

Cameron's desire to be part of a family may have led him to closely associate with other drug addicts. Jones Letter, Ex. 6 at 1; Rickard Letter, Ex. 3 at 2; Gatien Letter, Ex. 2 at 3. In fact, he referred to his addict friends, many of whom Cameron financially supported, as his "family." *Id.*

As the letters corroborate, however, Cameron now knows that his true family and friends are eager to serve as his "family" in every sense of that word: to support his quest for sustained sobriety and a productive life that showcases his talents and passions, which have previously taken a backseat to drugs. It is this support that propels Cameron to insist on the treatment he urgently needs to begin.

As one of Cameron's friends states in her letter to the Court:

> Cameron views his arrest as a gift in that it may have saved his life. He is truly a 'glass half full' person and is able to transform negative experiences into something positive. When I last visited him at MCC, he impressed me with his declaration -- to himself and those around him -- to use this experience as a life lesson to turn his life around. He sees pleading as a way to take responsibility and wholeheartedly believes something positive will come out of this situation. I see all the old traces of my friend back. He has hope, a glimmer in his eye and plans for the future[.]

Ex. 2 at 3-4.

## II. CAMERON DOUGLAS'S PERSONAL HISTORY

On the surface, it might appear that Cameron was born into a charmed life. His father, Michael Douglas, was embarking on what turned out to be a film career that rivals that of Cameron's grandfather, Kirk Douglas. His mother was a college-aged beauty who spoke five languages, had a European upbringing and was educated at the Georgetown School of Foreign Service. The family maintained residences on both coasts, where they entertained the famous and rich.



Outside the home, Cameron's family lineage did not prove a boon. His childhood was neither entitled nor sensationalized. Rather, the notoriety that came with being the child and grandchild of Hollywood movie stars brought him isolation and loneliness. *See, e.g.*, Rickard Letter, Ex. 3 at 1 ("Most of the kids on [our football] team picked on Cameron severely because he was Michael Douglas's son, myself included...") Diana Douglas Webster Letter, Ex. 25 ("[Cameron] always struck me as a lonely little boy, watchful and evaluating."); Webb Letter, Ex. 5 at 2 ("[I] understood how lonely [Cameron] felt. I could hear him from the guest bedroom as he hit his pillow and cried himself to sleep.").

---

[4] Mr. Douglas admitted as much while Cameron was a child, telling a reporter in 1984, (when Cameron was five years old) that his family "takes a backseat" to his film career. *See* http://www.youtube.com/watch?v=dNP6uUWpzFs. He recently echoed the sentiment, admitting that his decision to prioritize work over parenting had a negative impact on Cameron's childhood. *See, e.g.*, "Michael Douglas, Take Two" *Vanity Fair*, April 2010 ("[Douglas] can't help but see his own role in Cameron's fate. 'My priorities were very similar [to my father's],' Douglas says about Cameron's formative years. 'Career first.'").

███████████████████████████████████

██████████████████████████████████

████████████████████████████████ By the time

he was 13, Cameron's parents sent him to an out-of-state boarding school. Cameron resented the

decision as an attempt to "send him away" and begged to remain at home. Webb Letter, Ex. 5 at

2. As Cameron's friend remembers, "Cameron's adolescence was not a model of what creates a

well-rounded and confident man. He was constantly looking for acceptance and family wherever

he could find it. He just wanted to fit in and be loved like all of us do, but never had parents that

told him he could do anything because they loved him." Rickard Letter, Ex. 3 at 2.

███████████████████████████████████

██████████████████████████████████

████████████████████████

     In the wake of being sent to boarding school, Cameron learned that his parents

planned to divorce, devastating him and leading to serious drug use. Diana Douglas Webster

Letter, Ex. 25; Rickard Letter, Ex. 3 at 2; Webb Letter, Ex. 5 at 2. At the age of 13, Cameron

began to use marijuana. *Id.* By the time he was 15, Cameron used cocaine regularly. PSR at ¶

90.

     Cameron's descent into drug use cast a pallor on what could have been a

promising high school career. Cameron was an accomplished athlete; beginning in 10th grade, he

played varsity football, wrestling, and lacrosse. ████████████████████████

███████████████████████████████ He also was

involved in a modern dance troupe that performed locally. Ultimately, however, it was drugs

that overtook Cameron's life. He had repeated run-ins with school and local officials related to

his drug use. Though he completed his high school proficiency test before turning eighteen, he did not graduate with his class. PSR at ¶ 98.

Once eighteen, Cameron focused on establishing an identity separate from his father and drug-addled adolescence. He reduced his drug use and, on his own, enrolled in Santa Monica Community College. Eventually, Cameron decided to pursue a career in the music industry, and at age nineteen, moved to New York City to start a career as a Disc Jockey. One of Cameron's friends met Cameron when he was pursuing a position at a club she managed. The talent that Cameron exhibited in his "demo" was enough to guarantee him a coveted Friday night slot at the club. She describes Cameron's abilities as "immense... Crowds took notice of the young kid behind the turntables. He was an absolute hit... he lit up a room and was glowing that he was recognized for his talent[.] He was able to find a path that did not set him up for comparison to his father and grandfather." Gatien Letter, Ex. 2 at 2. Cameron's DJ talent led him to gigs at major private events in New York and Los Angeles, including the Vanity Fair Oscar party, and the official Emmy Awards and SAG Awards parties. Cameron eventually performed as a DJ at venues across the globe.

Cameron also pursued a career in film. He was conflicted about doing so, because while he loves acting he knew there would be an obvious risk of being compared to his father and grandfather. He also knew that matching their success presented a task that was more than daunting. At first, Cameron sought work as a production assistant on several films to get a sense for the movie-making process. He took acting classes, and auditioned for film roles. Cameron was cast in the film, "It Runs In the Family," starring his father, grandfather, and grandmother. Playing Mr. Douglas's college-aged son, Cameron earned uniformly positive reviews. *See, e.g.* "FILM REVIEW; Fathers, Sons, Grandsons, In the Script and Real Life,"

8

*The New York Times*, April 25, 2003 ("Michael's son Cameron makes a splashy acting debut as

21-year-old Asher, the older of Alex's two sons."); "Movie Review: It Runs In The Family," *The

Los Angeles Times*, April 25, 2003 ("Cameron Douglas plays a seemingly nonchalant slacker

only to catch us by surprise when the film's big emotional moment is handed to him, and he

comes through beautifully."); "Forget Ads: 'Family' Not Bad," *The Washington Post*, April 25,

2003 ("Cameron Douglas's unforced portrayal is less the caricature of a jerk than something that

feels like the channeling of his own genuine, though flawed, humanity.").

   Cameron's success could have marked the beginning of a promising acting career.

After "It Runs in the Family," Cameron was offered other film roles. But the pressure of

pursuing a career that brought so much success to his father and grandfather overwhelmed

Cameron, and he declined most of these offers. After completing one other film, Cameron

abruptly stopped pursuing movie roles and DJ gigs -- and reverted back to a life of drugs. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

   Cameron's drug use intensified. Powder cocaine gave way to intravenous liquid

cocaine and heavy drinking. By the time he turned twenty-five, Cameron and his friends moved

on to heroin, often referred to as "the hardest drug." His heroin habit escalated to the point

where he was injecting it five to six times a day, sometimes taking hours to find a useable vein.

Meanwhile, he cut off contact with many of his friends, and created a social circle made up

mostly of drug addicts. Cameron's life revolved around his drug use. Millman Letter III, Ex. 28

at 1.  He referred to his fellow addicts as his "family" – many of whom gravitated to him because he had access to family funds to pay for their habits, *see* Rickard Letter, Ex. 3 at 2; Gatien Letter, Ex. 2 at 3 -- and became involved in a romantic relationship that involved a mutual affinity for narcotics.

████████████████████████████████████████████████████

████████████████████████████  On one occasion, they sought the assistance of a drug interventionist, who helped stage an intervention for Cameron.  Cameron ultimately agreed to enter rehab, an endeavor that was rendered futile by the fact that a member of his "drug family" remained nearby and surreptitiously provided drugs to him while he was in treatment.  This was part and parcel of a recurrent theme for Cameron: his "drug family" did not want Cameron to leave because they saw that with Cameron's access to funds they could fuel their own addictions without having to maintain jobs or responsibilities.  Rickard Letter, Ex. 3 at 2; Gatien Letter, Ex. 2 at 3.

In 2006, Mr. Douglas tried again to convince Cameron to enroll in a rehabilitation program. ████████████████████████████████████████████████

████████████████████████████████████  PSR at ¶ 80.  Cameron chose the latter, a fateful decision that led him to seek money through drug dealing.

## III.    CAMERON'S OFFENSE CONDUCT

### A. Cameron's Participation in A Conspiracy to Distribute Crystal Meth and Cocaine, While Serious, Was Not Long Lasting

In the midst of his heroin addiction, and after his father cut him off in 2006 from the family funds, Cameron began engaging in the underlying offense conduct.  Unable to sustain work, yet in need of money to support his addiction, Cameron agreed to assist a friend in locating methamphetamine ("crystal meth") for a New York-based drug dealer.  Cameron asked

10

the person who provided him with heroin for personal use in California if he could provide distribution quantities of crystal meth. Soon thereafter, Cameron was acting as a middleman for crystal meth between the California dealer and the New York dealer. On some occasions, Cameron sent cocaine that he obtained from the California dealer to another New York acquaintance. Cameron used the money he realized from these sales to fuel his heroin habit, as well as the habits of his addict "family."

Cameron's involvement in the narcotics trade did not last long. Approximately a year after it started, in early 2007, Cameron restarted a tenuous relationship with his father and stopped brokering drug deals. With his father's financial support, Cameron no longer needed to sell drugs to obtain money -- but his addiction to heroin continued and worsened. Over the next two years, Cameron and his addict girlfriend used heroin multiple times a day, and did little else.

In 2009, fed up with what drugs had made of his life, Cameron decided to make a change. He moved back to New York City to "get clean." In anticipation of his move to New York, and on the advice of the drug interventionist, Cameron saw a substance abuse specialist in California who prescribed him Suboxone, a detoxification drug to ease withdrawal from heroin. Understanding that heroin withdrawal causes intolerable discomfort even with the assistance of medication, Cameron intended to wait until after he settled in New York to use it.

Cameron arrived in New York City in June 2009 -- approximately two years after he had ceased drug dealing. He took up residence at the Gansevoort Hotel while looking for a more permanent residence, but while staying there encountered the New York dealer outside the hotel entrance. The New York dealer told Cameron that he, too, was staying at the Gansevoort and asked if Cameron would like to have dinner. After dinner, the New York dealer asked Cameron to discuss a business proposition and invited Cameron to his hotel room, where the

11

New York dealer asked Cameron if he could send him a pound of crystal meth. Still impaired by his addiction, Cameron agreed and later flew to California to arrange the requested transaction.[5]



---

[5] The New York dealer called Cameron in the intervening period to amend the order to half a pound, rather than a full pound.





14





Although no ongoing drug treatment is available to him at the MCC, and drug use in prison is "quite prevalent," Cameron took advantage of Dr. Millman's assistance to aid him in his recovery efforts.  Millman Letter III, Ex. 28 at 2.

Today, Cameron is nearly eight months sober -- the longest period of sobriety he has experienced in his adult life.  Michael Douglas Letter, Ex. 27 at 4 ███████████████

████████████████████████████████ There is no question that if allowed to continue treatment, full rehabilitation is within Cameron's reach.  Millman Letter III, at 2.

Cameron's family and friends marvel at interacting with Cameron during this period, making clear their desire to help him stay clean.  Michael Douglas Letter, Ex. 27 at 3 ████████████████████████████████████; Gatien Letter, Ex. 2 at 1; Kimmel Letter, Ex. 18 at 2; Diandra Douglas, Ex. 26 at 4.

As part of his quest for sobriety, Cameron has adopted a healthy lifestyle, no small feat at a high security prison such as the MCC.  He exercises rigorously two-and-a-half hours every day, maintains a healthy diet by eating only natural, simple foods, and competes regularly in raquetball and handball games.   Cameron has also pursued avenues of emotional and intellectual growth.  He maintains a journal, in which he writes self-reflections. ████████████

████████████████████████████████████████████████

███████████████████ Cameron has found inspiration from James Allen's *As A Man Thinketh*, from which he reads daily.  The book contains a series of passages centered about the proposition that a man is the sum of his thoughts, and the following passage particularly resonates with Cameron:

> Man is made or unmade by himself; in the armory of thought he forges the weapons by which he destroys himself. He also fashions the tools with which he builds for himself heavenly mansions of joy and strength and peace. By the right choice and true application of thought, man ascends to the Divine Perfection; by the abuse and wrong application of thought, he descends below the level of the beast. Between these two extremes are all the grades of character, and man is their maker and master.

18

Cameron has also reached out to the family and friends that he had shunned in favor of drugs. He visits with his parents and speaks to them on the phone each week and has easily spent more quality time with them in the last eight months than in the last five years. Cameron has also reconnected with friends through letters and phone calls. In these communications, Cameron expresses remorse for his involvement in the drug trade and emphasizes his desire for a second chance. *See, e.g.,* Gatien Letter, Ex. 2 at 3; Eschardies letter, Ex. 9 at 2. As the letters appended to this submission set forth, Cameron has a willing and eager support system awaiting him upon his release. Diandra Douglas Letter, Ex. 26 at 4; Michael Douglas Letter, Ex. 27 at 3; Joel Douglas Letter, Ex. 8; Webb Letter, Ex. 5 at 3; Jones Letter, Ex. 6 at 2; Akers Letter, Ex. 11; Kimmel Letter, Ex. 18 at 2; Rickard Letter, Ex. 3 at 2.

Cameron's efforts have placed him on a path to recovery. As Dr. Millman concludes, "with the proper treatment and support system, Cameron's relationship with drugs will be over, and a sober and useful life is within his grasp." Millman Letter III, Ex. 28 at 2.

## ARGUMENT

We respectfully ask the Court to downwardly depart and vary substantially from the Sentencing Guidelines recommended range, and to impose a sentence of time served with a lengthy period of supervised release, or in the alternative, to a period of incarceration of approximately 42 months, which would enable Cameron to enter drug treatment almost immediately.[6]

---

[6] While courts must pay homage to the Sentencing Guidelines, they are only advisory. *Gall v. United States,* 552 U.S. 38, 46 (2007); *Kimbrough v. United States,* 552 U.S. 85 (2007); *United States v. Booker,* 543 U.S. 220 (2005). Therefore, while "as a matter of administration and to secure nation-wide consistency, the Guidelines should be the starting point and the initial benchmark" in determining the sentence imposed, a district judge "may not presume that the Guidelines range is reasonable." *Gall,* 552 U.S. at 596-97. Rather, the judge "must make an individualized assessment based on the facts presented." *Id.* at 597. Indeed, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 598, quoting *Koon v. United States,* 518 U.S. 81, 98 (1996). In making such an



██████ Recognizing that his addiction helped propel him into the drug trade, Cameron has

taken the impressive step of seeking and maintaining sobriety for eight months in a facility

where no drug treatment is offered. We respectfully ask that the sentence imposed allow

Cameron to seek drug treatment at the earliest possible time, so as to reduce the risk of relapse

████████████████. For the reasons stated below, such a sentence includes a sentence

of either time served, or approximately 42 months' imprisonment.

████████████████████████████ Cameron voluntarily

withdrew from the conspiracy two years before being re-approached by a government

cooperator, and in the past eight months has made important strides towards a new, sober life.

Allowing Cameron -- a non-violent addict who has demonstrated a genuine resolve to overcome

his addiction -- access to immediate treatment will substantially reduce any chance of recidivism.

Furthermore, because Cameron had not spent any significant time in prison prior to this arrest,

---

individual assessment, the district court must contemplate, in addition to the Guidelines, the factors laid out in 18 U.S.C. 3553(a). *Gall*, 552 U.S. at 49-50. Chief among these is the Parsimony Clause, which "instruct[s] district courts to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101 (internal quotations omitted).

the sentence here need not include a long period of imprisonment in order to deter him from future misconduct; he has already been incarcerated long enough to ensure that. ███████

████████████████████████████████████████████████████████

██████████████████████████████████████████

      Simply put, there is no need to sentence Cameron to a long period of imprisonment, but there are many reasons to sentence him in a manner that will allow him access to timely drug treatment. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

## POINT ONE

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████















**POINT TWO:**



Accordingly, and for the reasons below, we respectfully ask the Court to depart and/or vary downward to a sentence of either time served or approximately 42 months' imprisonment, so that Cameron -- a non-violent addict -- may receive this needed treatment as quickly as possible.

It has long been the law that a court may downwardly depart from the Guidelines in order to allow a defendant access to drug rehabilitation. *United States v. Maier*, 975 F.2d 944 (2d Cir. 1992). In fashioning a downward departure for rehabilitative efforts, a court may consider all of the pertinent circumstances, including the nature of the addiction, any contemplated or past rehabilitation program, the defendant's commitment to rehabilitation, and a doctor's assessment of any rehabilitation program and the hazards of interrupting that progress. *Maier*, 975 F.2d at 948; *United States v. Williams*, 65 F.3d 301, 305 (2d Cir. 1995). In particular, a defendant's "awareness of [his drug dependency] and the demonstrated willingness to act to achieve rehabilitation, thereby benefiting the individual and society," justifies a downward departure. *Maier,* 975 F.2d at 948.

Like the defendant in *Maier*, Cameron is a severe heroin addict. Cameron's heroin use spanned years and was so severe that at the time of his arrest, he was injecting heroin five to six times a day.

29

Also like the defendant in *Maier,* Cameron has expressed a genuine desire to be sober. Despite the scant resources available to him at the MCC, he has spent the last eight months committed to becoming sober for the longest period in his adult life. While the MCC offered him no drug treatment, Cameron had sought out the assistance of Dr. Millman's help and attends sessions with him weekly, ███████████████████████████████████

██████████████████████████████████ Cameron has also committed himself to a healthy lifestyle of exercise and good diet. Furthermore, as many of the attached letters confirm, throughout his incarceration Cameron has made sincere expressions to his friends and family that he is "done with heroin" and ready to start the productive and fulfilling life that drugs prevented him from having.   Gatien Letter, Ex. 2 at 1; Kimmel Letter, Ex. 18 at 2; Barba Letter, Ex. 14; Diandra Douglas Letter, Ex. 26 at 4.  ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

███████████████████████████ In *Maier*, the District Court found that the treatment available to the defendant if incarcerated would not adequately help her rehabilitate, while the treatment available at an outside hospital would.  *Maier*, 777 F. Supp. at 294 ("If incarcerated,

Maier would be unable to continue methadone treatment in an effective manner.")  The same is true here. 

. The supervised release term could be significant and include special conditions requiring successful treatment of the program, regular drug testing, community service, or any other element the court determines is appropriate.  It cannot be said that such a sentence would not adequately punish Cameron.

*See Gall v. United States*, 552 U.S. 38, 48 (2007) (probation is not an act of leniency); *Collado v. United States*, No. 07 Cr. 1144, 2008 U.S. Dist. LEXIS 44010, *15 (S.D.N.Y. June 5, 2008) ("Supervised release is tantamount to probation, and the courts and the United States Sentencing Commission have recognized that probation is both rehabilitative and punitive . . . [P]robation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing[.]").

Even if the Court determines that a sentence of incarceration is appropriate, we respectfully ask that the Court sentence Cameron in a manner that allows him to immediately take advantage of drug rehabilitation programs available in prison. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

Should the Court determine that a sentence of incarceration is necessary, it can ensure Cameron's immediate access to drug treatment in a "residential drug abuse program" (RDAP) -- the kind Dr. Millman recommends if Cameron remains in prison, Millman Letter III, Ex. 28 at 2. -- if it sentences him to a term of approximately 42 months' incarceration. BOP regulations provide that an inmate can enter an RDAP if he has a "verifiable substance abuse order" (which is not in dispute here) and is committed to completing all components of the program.[11] 28 C.F.R. 550.53(b). As a matter of BOP Policy, an inmate is eligible to begin an RDAP when he has 27 months remaining on his sentence, after all calculations have been made for time served and good behavior. For Cameron to be able to enter RDAP within as short a

---

[11] Based on private and public residential treatment models across the country, RDAP comprises two separate phases. First is the Residential Phase (Phase I), where inmates reside for nine months in a segregated treatment unit, a "therapeutic community" where inmates live, socialize, and attend classes and therapy together as a group. During this residential phase, inmates receive psychological testing, drug and alcohol education, individual and group counseling, anger management and stress reduction therapy with trained drug treatment specialists (DTS), three hours per day, five days per week, for a presumed total of 500 hours. The balance of an inmate's day during treatment is spent at job assignments, participating in other programming, or individually using free time. Homework assignments are routinely given and DAP inmates are expected to read reference materials, keep a journal and complete their assignments each evening before class the next day. After successfully completing the residential phase, the inmate is essentially guaranteed (as Phase Two) six months in a Pre-release "Aftercare." Aftercare is release back to the community or the geographical location where the inmate plans to reside after the expiration of his sentence. Pre-release inmates are first placed at a Residential Re-entry Center or "RRC" which is in effect, a work-furlough or work release facility, where the inmate readjusts from prison to public life through employment and continued counseling.

period of time as possible, he should be sentenced to a term of approximately 42 months' imprisonment.[12]  A lower sentence will mean he has no access to RDAP as he completes his term of imprisonment, while a higher sentence will translate into a wait for the program and possibly frustrate the purpose of agreeing to an accelerated sentencing date.

Imposing upon Cameron a sentence that will permit him to enter RDAP at the earliest possibility has precedence in the law.  Courts in this jurisdiction have fashioned sentences that would allow the defendant to enter treatment immediately upon designation. █

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████

The fact that Cameron has demonstrated an interest in rehabilitation despite being been denied the treatment he requires in the MCC is further grounds that he should be allowed into an RDAP immediately. *United States v. Williams*, 65 F.3d 301(2d Cir. 1995). In *Williams*, a case that preceded *Booker*, the defendant  demonstrated an interest in rehabilitation, yet had no opportunity to pursue this interest due to his incarceration -- just like Cameron at MCC. *Id.* at 306.  Complicating matters was the fact that "the only program available to [the defendant]

would not take him unless he was within 18 to 36 months of release," which represented a small fraction of Williams's Guidelines range. The Second Circuit affirmed the district court's determination that a departure was necessary to allow him to enter treatment. Just as in *Williams*, Cameron's inability to receive treatment as he awaits sentencing, along with the steps he has taken on his own to sustain his sobriety while in prison, should weigh heavily in favor of a downward departure. Moreover, as was the case in *Williams*, the Court may impose a sentence calculated to allow Cameron immediate access to treatment and piggyback the period of incarceration with a special condition of supervised release requiring him to successfully complete drug treatment programs outside of jail. *Id.* at 308-09. Such a sentence will serve to rehabilitate Cameron and thus severely reduce the risk of recidivism and at the same time impose punishment for his past acts by incorporating his already significant prison sentence and a probationary period.

### B. The Court Should Award Cameron A Variance From The Guidelines So That He May Enter Treatment As Soon As Possible

We respectfully submit that Cameron is also entitled to a variance from the Guidelines on the basis of his need for treatment, pursuant to 18 U.S.C. § 3553(a)(2)(D), which asks a sentencing court to consider "the need to provide the defendant with needed . . . medical care . . . in the most effective manner."

Although no drug treatment program is available in the MCC, Cameron has committed himself to rehabilitation while there. We ask that his sentence allow him to enter into a formal treatment program as soon as possible. Section 3553 provides ample basis for this request.

34

Section 3553(a)(2)(D) provides sentencing courts with power to accord defendants in need of drug rehabilitation the opportunity to maximize the effectiveness of BOP-provided drug treatment programs. I█████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████; *see also United States v. Collins*, 2007 WL 1723718, at \*7 (S.D.N.Y. June 7, 2007) (citing §3553(a)(2)(D) in recommending that defendant be designated to a facility that could provide the most intense drug treatment assistance available and conditioned his supervised release upon continued drug treatment).

Courts often cite Section 3553(a)(2)(D) to support the reduction of a defendant's term of imprisonment in order to facilitate the defendant's access to the medical treatment outside of prison. In *United States v. Collins*, the court sentenced a heroin addict charged with intent to distribute heroin, to a 36-month term of imprisonment to be followed by a 1-year term of supervised release, rather than a sentence within the higher, recommended Guidelines range. The sentence was imposed in recognition of the fact that, in light of defendant's sincere quest for rehabilitation, "Collins is in greater need of additional drug treatment than additional incarceration." 2007 WL 1723718, at \*6 (S.D.N.Y. June 7, 2007). *See also United States v. Rivera*, 2006 WL 1596814 at \*4 (S.D.N.Y. June 9, 2006) (same).

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████





He, too, needs continued care to overcome his addiction, and he has already demonstrated a nearly 8-month commitment to that care – despite the fact that the MCC has offered him none.

In short, Cameron needs and very much wants drug treatment. Although denied such treatment by the MCC, he has committed himself to a healthy lifestyle in the hope that he will be able to take advantage of a rehabilitation program soon. Dr. Millman makes clear that successful treatment is within Cameron's reach, but as time passes and Cameron continues without treatment, ███████████████████████████, and his chances of rehabilitating himself shrinks. Millman Letter III, Ex. 28 at 1, 2. We respectfully ask that the

Court fashion a sentence of either time served or approximately 42 months' imprisonment, to allow Cameron to receive urgently needed medical care in the most effective way possible.

## POINT THREE

### The Section 3553(a) Factors Militate
### In Favor Of A Substantial Variance From The Guidelines

In sentencing Cameron, the Court must contemplate -- in addition to the advisory Guidelines -- the factors laid out in 18 U.S.C. 3553(a).  *Gall*, 552 U.S. at 49-50.  The applicable Section 3553(a) factors militate in favor of finding that a substantial variance from the Guidelines is warranted here.[14]

*The Nature And Circumstances Of The Offense And The History And Characteristics Of The Defendant*—18 U.S.C. § 3553(a)(1)

The nature of Cameron's offense and his personal character both justify a downward variance from the Guidelines range.



---

[14] These factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed-(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established in the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (7) the need to provide restitution.  18 U.S.C. § 3553(a).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

        Similarly, a sentence of time served with a significant period of supervised release is reasonable here. As the Court in *Gall* noted, a term of supervised release that is contingent on successful completion of a drug treatment program is not to be taken lightly. "Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Id.* at 48. For example, "probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court." *Id.*

        Moreover, Cameron's "character" militates in favor of a lenient sentence. Like *Gall*, Cameron withdrew from his original drug dealing activities. Before meeting the government informant years later, he had taken steps towards his sobriety, evidenced by his

---

[15] Cameron's record is also minor and stems from his addiction. The only reason that he is in Criminal History Category II is because of the application of U.S.S.G. § 4A1.1(d) due to a period of probation arising out of a DUI in 2005. PSR ¶¶ 52, 58. Under this circumstance, Cameron is more accurately in Criminal History Category I. *See* U.S.S.G. § 4A1.3(b)(1). *See also United States v. Gordon*, 2006 WL 1675921, at *4 n.1 (S.D.N.Y. June 16, 2006) (lowering criminal history from Category III to Category II noting that "Gordon's two prior offenses were non-violent, drug-related, and most likely stemmed from his substance abuse and addiction").

visits to Dr. Millman in early 2009, his consulting with a drug interventionist in the spring of 2009, and his obtaining a prescription for detoxification medication prior to his arrest. He had also obtained an acting role in a film that was about to begin production -- his first in several years. His mother and father had each recently relocated to New York, and Cameron had reconnected with both in the hopes of starting anew.



The work and change that Cameron has accomplished in the past eight months marks a sharp departure from a drug-addled life, and are a testament to his character. Combined with an assessment of his offense, they provide a powerful reason to downwardly vary from the Guidelines range. *See Gall*, 552 U.S. at 54 ("[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.") (internal quotations omitted).

***The Need For The Sentence Imposed to Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Promote Just Punishment For The Offense—18 U.S.C. § 3553(a)(2)(A)***

Cameron is an addict, and committed his crimes while addicted to heroin. ▮▮▮

[REDACTED]

The empirical evidence shows that non-violent drug offenders who are addicts, but who are offered and successfully complete treatment, have a low risk of recidivism. *See, e.g.,* When Brute Force Fails: How to Have Less Crime and Less Punishment, Mark A. R. Kleiman (Princeton University Press 2009); Hon. Peggy Fulton Hora & Theodore Stalcup, Drug Treatment Courts in the Twenty-First Century: The Evolution of the Revolution in Problem-Solving Courts, 42 Ga. L. Rev. 717 (Spring 2008) ("Incarceration has proven ineffective in decreasing recidivism among alcohol and other drug users . . . continuing to pursue incarceration as a complete solution for drug-addicted offenders despite the low success rates may actually decrease public safety.  Reducing recidivism by providing effective drug treatment for offenders is a logical and successful strategy[.]"); Billie S. Erwin & Lawrence A. Bennett, U.S. Dep't of Justice, New Dimensions in Probation: Georgia's Experience With Intensive Probation Supervision (IPS) 6 (1987) (stating IPS program requiring its members to be drug free has reduced recidivism in parolees by 90%); Gary Field, The Effects of Intensive Treatment on Reducing the Criminal Recidivism of Addicted Offenders, 53 Fed. Probation, Dec. 1989, at 51, 55 (finding in a criminal recidivism study that "[a]ddicted offenders who receive little or no treatment show an accelerating pattern of criminal activity over time."). *See also* Millman Letter III, Ex. 28 at 2 ("[I]n my more than 40 years studying substance abuse and dependence, I have come to believe that long periods of incarceration do not cure addiction, not do they facilitate

rehabilitation."). In fact, "the criminal activity of addict-offenders seems to rise and fall in step

with their drug consumption, and importantly, the relationship holds whether reductions in drug

use are unassisted or are the product of formalized treatment, and whether participation in

treatment is voluntary or coerced." Klieman at 159. [16]

  The Court may promote respect for the law by sentencing Cameron in a manner

designed to afford him quick and needed treatment and rehabilitation, ▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉, thereby significantly decreasing the

chance that drugs will prompt future misconduct. *See, e.g., United States v. Harding*, 2006 WL

2850261, at * 5 (S.D.N.Y. Sept. 28, 2006) ("[t]hat these conditions likely contributed to the

defendant's participation in the instant offense and may be ameliorated over the short term

through adequate treatment weighs in favor of imposing a non-Guidelines sentence."); ▉▉▉



▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉; *United*

*States v. Behr*, 2006 WL 1586563, at *4 (S.D.N.Y. June 9, 2006) ("[The defendant's] legal

problems also seem to be related to his drug addiction and the need to support his habit").

***The Need For The Sentence Imposed to Afford Adequate Deterrence To Criminal Conduct—***
***18 U.S.C. § 3553(a)(2)(B)***

  A long period of incarceration is not required to afford adequate deterrence here,

because Cameron has never served a significant sentence of incarceration prior to this arrest.

Courts recognize that where a defendant lacks prior experience with incarceration, a long

---

[16] *Citing* M. Douglas Anglin and George Speckart, "Narcotics Use, Property Crime and Dealing: Structural Dynamics Across the Addiction Career." *Journal of Quantitative Criminology* 2 (1986); David N. Nurco, Thomas E. Hanlon, Timothy W. Kinlock, and Karen W. Duszynski, "Differential Criminal Patterns of Narcotic Addicts Over An Addiction Career," *Criminology* 26 (1988): 407-23; M. Souglas Anglin and Yih-Ing Hser, "Treatment of Drug Abuse," *Crime and Justice* 13 (1990): 393-460.

sentence is not required to deter that defendant from future conduct. *See, e.g., United States v. Lian*, 2007 WL 1187980 (S.D.N.Y. April 20, 2007) (court sentenced defendant to below Guidelines range, to time served and three years supervised release, noting that the defendant had "not been incarcerated prior to the instant offense"); *United States v. Bidon*, 2006 WL 3025876, at *5 (S.D.N.Y. Oct. 24, 2006) (court sentenced defendant to below Guidelines range, to 48 months imprisonment and five years supervised release noting defendant's lack of prior incarceration); *United States v. Harding*, 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006) (court sentenced defendant to below Guidelines range, to 48 months imprisonment and five years supervised release noting defendant's lack of prior incarceration); *United States v. Hernandez*, 2006 WL 870933, at *4 (S.D.N.Y. Apr. 5, 2006) (court sentenced defendant to below Guidelines range, to time served and three years supervised release noting defendant's lack of prior incarceration); *United States v. Arreaga*, 2006 WL 278156, at *7 (S.D.N.Y. Feb. 2, 2006) (court sentenced defendant to below Guidelines range, to 24 months imprisonment and three years supervised release noting defendant's lack of prior incarceration).

Other than a short incarceration for a juvenile probation violation, Cameron has never been incarcerated, and the pre-sentence incarceration in this case has made a profound impact upon him. ██████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ An extensive period of incarceration would add no additional deterrent effect upon Cameron, and little to no deterrence would be gained at the cost of warehousing Cameron in prison away from the support and encouragement of family and friends while he struggles to defeat his addiction.[17] *See United States v. Harding*, 2006 WL

---

[17] As the letters appended to this submission indicate, Cameron's family and friends have mobilized to create a support network to support him in his quest for sobriety and for a real chance of being a productive member of

43

2850261 at *5 ("Also pursuant to § 3553(a)(1), the Court takes note of the significant network that is ready to support Harding upon his release from prison. In addition to his mother, other members of the community have expressed to the Court their willingness to facilitate Harding's re-entry, including accepting him as a tenant and assisting him in finding employment. Such circumstances again weigh in favor of a non-Guidelines sentence."); *see also* Millman Letter III, Ex. 28 at 2. Rather, allowing Cameron a chance to beat his addiction and become a productive member of society – particularly given his efforts at obtaining that result thus far – would encourage other addicts to likewise fight their addiction, and ultimately reduce the recidivism rate. Kleiman, at 159.

***The Need For The Sentence Imposed to Protect The Public From Further Crimes Of The Defendant* —18 U.S.C. § 3553(a)(2)(C)**





society. Diandra Douglas Letter, Ex. 26 at 4; Michael Douglas Letter, Ex. 27 at 3; Joel Douglas Letter, Ex. 8; Webb Letter, Ex. 5 at 3; Jones Letter, Ex. 6 at 2; Akers Letter, Ex 11; Kimmel Letter, Ex. 18 at 2; Rickard Letter, Ex. 3 at 2.



## CONCLUSION

For the foregoing reasons, we urge the Court to impose a sentence that will permit Cameron Douglas to enter a drug treatment program at the earliest opportunity, either with a sentence of time-served or a period of approximately 42 months, with significant supervised release obligations, which would allow his timely entry into a Bureau of Prisons drug treatment program.

Respectfully submitted,

Daniel M. Gitner
Jennifer R. Ridha

LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue, 33rd Floor
New York, New York 10110
(212) 921-8399

Nicholas M. De Feis
Allison S. Menkes

DE FEIS O'CONNELL & ROSE, P.C.
500 Fifth Avenue, 26th Floor
New York, New York 10110
(212) 768-1000

Attorneys for Defendant Cameron Douglas

45

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on the 5th day of April, 2010, she caused a true copy of the foregoing DEFENDANT CAMERON DOUGLAS' SENTENCING MEMORANDUM to be served by hand and e-mail upon all parties on the attached service list.


**By HAND**
Aimee Hector
U.S. Attorney's Office
One St. Andrew's Plaza
New York , NY 10007


**By E-MAIL**
Nicholas M. DeFeis
Allison S. Menkes
Philip C. Patterson
De Feis O'Connell & Rose, P.C.
500 Fifth Avenue, 26th Floor
New York , NY 10110


Dated: April 5, 2010

LANKLER SIFFERT & WOHL LLP

By: _____
Jennifer R. Rihda

500 Fifth Avenue
New York, New York 10110
(212) 921-8399
jrihda@lswlaw.com

*Attorneys for the Defendant Cameron Douglas*

NANCY HERSCH INGRAM



March 10, 2010

Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Regarding: Cameron Douglas

Dear Judge Berman,

I am the godmother of Diandra Douglas, and have known her since she was two years old. Therefore, I have known Cameron Douglas all his life, and have been witness to the powerful influences that brought a very sensitive and intelligent boy to his present circumstance.

My involvement with the family began in 1958 when I met Diandra's mother, Patricia Morrell Luker, in a drawing class in Washington D.C. She was then a vibrant fellow artist, pilot, and skilled yachtswoman. The illness that would cloud her life and that of her daughter was not yet apparent.

The Lukers lived in Georgetown, as Robert Luker, a naval officer was stationed in DC. The family was active and socially prominent, but even then I observed the dynamic that would cause subsequent separation. This painful event would also have consequences for the future Cameron Douglas.

████████████████████████████████████████████████ Patricia and the very young Diandra left Washington to live in Europe. The move ended any sense of stable family life for mother and daughter.

During this time, I often visited with them in Mallorca, Spain and Diandra would stay with me in Virginia when her mother traveled. The connection was never broken.

That Michael and Diandra dearly loved their only child was always abundantly clear, but both lacked mature parenting skills. Michael has made repeated public disclosures of his "career first" attitude during Cameron's formative years, as did his father. Like Kirk Douglas, he was an absentee father.

This left Cameron with a very young and inexperienced mother. Diandra was only nineteen when she married the 32 year-old Michael. In addition, she had little mentoring from her own mother, who had grown increasingly ill, from Diandra's childhood forward.

Honorable Richard M. Berman
March 10, 2010
Page 2

Diandra went from Swiss boarding schools to being the wife of a mega star and mother to
Cameron, with no training for such overwhelming responsibilities. She was 21 years-old at
Cameron's birth, but much younger in experience.

Cameron grew up loved, with enormous privilege and little structure. All this was in the shadow
of mythic forebears, and the embarrassment and scrutiny of the paparazzi. He was a very sweet
and shy boy, shunning any pretension to the point of identifying with the underdog. That he
somehow needed to "be somebody" was evident, but who should he be?

It has been heartbreaking to helplessly witness his descent into addiction. However shocking, his
incarceration may have saved his life. Now, as he recovers from the downward spiral of
addiction, it has certainly taught him a lesson. It has also been a wake up call for his family.

Last Christmas Eve, he visited with his three half siblings, all five years old. They asked,
"Why are you in this place?" Cameron answered, "Because I did something very wrong."

Under the influence of drugs, he did something very wrong. Yet, even then, he has never been
violent or unkind. I saw his sweet interaction with the young children of his parents' second
families. He could have been jealous or resentful that these children had the mature parenting
that he was denied, but he is so gentle and loving with them.

Cameron and his parents have both learned, however painfully, to examine their lives, and
correct their course. With all my heart, I ask that you give Cameron Douglas a lenient sentence,
that he may receive the treatment he needs, and have a chance at renewed life.

If pertinent: I am a working artist, currently serving on the boards of George Mason University
and The Center for the Arts, as well as on the Architectural Review Board of the City of
Manassas, Virginia. I recently served on the National Advisory Board of The National Museum
of Women in the Arts and the Board of Visitors of Wake Forest University.

My deepest thanks for your consideration,

Sincerely,

Nancy Hersch Ingram



Jen Gatien

Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Regarding: Cameron Douglas

Dear Judge Berman,

    I am writing to you to plead for leniency in the sentencing of Cameron Douglas. We have been extremely close over the past 12 years and I have seen Cameron in various stages of his life—first as a teen full of possibility, then as a successful DJ and actor, and in the last few years as a heroin addict who lost it all. I have known Cameron to be an extremely sensitive, kind, loving and engaging person. I unfortunately have also witnessed him descend into addiction and have seen the destruction that it wreaked on his family, his career and himself. I know how much he regrets not taking past opportunities he had to get sober and takes accountability for the mistakes he has made. Given my extensive history with Cameron, I feel that I know him very well and would like to take this opportunity to attest to his many redeeming qualities: his generous spirit, his compassionate heart and his kindness to everyone he encounters.



I have seen a similar shift in Cameron since his arrest and incarceration, and I am confident that drugs will no longer be part of his life. It has totally altered how he feels about drugs given the immense pain and humiliation they have brought on him and those around him.

    I am in no way condoning his criminal activity, but I truly believe Cameron resorted to any means necessary to fuel his drug addiction and that his sole motivation for his criminal behavior was a longtime heroin addiction. The deep despair and isolation that heroin brought led

him to today, where he stands before you to be sentenced. He has never stolen despite having access to valuables—he is not of a criminal mindset. He has been separated from people who engaged in drugs with him and participated in the drug dealing—this has allowed him to see the world differently. His friends of late have all been fellow drug addicts and they are no longer in his life. Cam has sought out an addiction specialist while at MCC because he intends to stay clean. He sees who his true friends are as they write to you to attest to how lovely a human being he is—we all know the true essence of Cameron and he is a loving, vibrant and creative person with immense opportunities before him to do good in the world.

My bond with Cameron was cemented for me when we realized that we each dealt with the weight of a father who was recognizable in a similar way, although his family name was globally inescapable with both his father and grandfather considered to be Hollywood royalty. For me, my father was a local notorious figure and there were perceptions that I would be a troubled party girl or a druggy "club kid." For Cameron, it was assumed that he was born with a silver spoon and raised by "Ken and Barbie" parents that provided a fairy tale life. We both responded by being the opposite of what was anticipated. I applied to Trinity on my own, graduated in the top of my class, never tried a drug of any kind and went on to get my BA in film and anthropology from Columbia University. Cameron, on the opposite end of the spectrum, tried to shape an identity by leaving the boarding school attended by his father, rejecting the socialite circles, rebelling against authority, getting tattooed at 16 years old and immersing himself in urban culture (music, breakdancing, skateboarding, graffiti) that blatantly opposed his mother's taste and aesthetics.

Cameron came into my life when we were both very young—I had recently graduated from college and was booking DJs while Cameron was trying to establish himself in the music world. I was hiring new music talent and a mutual friend passed along a sample of Cam's work. He showed immense talent—the tape started out with classical music with a thumping bass that gradually gave it a dance beat. I was impressed and he was given a Friday night slot to DJ. He not only played records, but put on a performance by breakdancing to the music. Crowds took notice of the young kid behind the turntables—he was an absolute hit. I also saw something in him that was so endearing and warm, he lit up a room and was glowing that he was recognized for his talent. It was a good time in his life—he was able to find a path that did not set him up for comparison to his father and grandfather. I am confident that he will find his own path once again. Cameron loves to perform, he goes to great lengths to bring a smile to people's faces and he has the gift of public speaking. I recall when he was his father's best man, Cam had to give a speech in front of 300 people at the reception, and without even rehearsing one time or writing down a word, he stood in front of the crowd and had everyone both in stitches and tears with his memories of his father. Another time, as a surprise, he came straight from the airport unannounced to my sister Hunter's 12th birthday party to breakdance for her and her friends. The young girls circled around him as he danced. She felt special and it was meant so much to her that she still refers back to that day as one of her best memories.

Cameron rarely brought up his issues with his parents, but it became glaringly apparent that he was not a priority for them. As I got to know him and gained his trust, Cameron shared many personal stories that he kept to himself as his parents were both high profile people. I think he had a lot of shame about his childhood with a revolving door of caretakers, some of whom

actually engaged in alcohol and drug use with him. ███████████████████████████ ████████████████████████████████████████████████████████████████ He was sent to boarding school at a very young age, was left regularly with the Webb family in New Jersey for long periods of time and was exposed to seeing his parents' extramarital activities. I know how much these mixed messages and his chaotic home environment tormented him—he started drinking at a very young, tender age. ████████████████████████████████ ██████████████████████████████ Cameron told me that he moved on to "harder" drugs as a means to block out his deep feelings of pain. His teen years were spent without any real supervision. Many of those hired to oversee Cameron engaged in highly inappropriate behavior. When Cameron was 19 years old, I recall seeing a 45 year-old chef, who was cooking Thanksgiving dinner, ask Cameron to do cocaine with in his mother's home. It stunned me and yet it seemed so normal to Cameron.

I strongly feel that because he was so ignored as a child, Cameron was able to transform that obstacle into a strength in how he interacts with people. He treats everyone with respect and friendliness, and tends to give extra attention to those who are most overlooked. In 2001, Cameron invited me to join him on a trip with his mom, her boyfriend and their two children. ██████████████████████████████████████████████████████ At the beach, he spent each day attending to Zack and taught him to fly a kite. I was touched by the care and time he took to be with Zack. It was authentically coming from a place of compassion as his instinct is to want to make each person feel important. I noticed this behavior repeatedly whenever Cameron was with Zack. When we went to Long Island for a weekend, he played on the trampoline with Zack while everyone else was busy with their own plans. ██████████████ ████████████████████████ He did this with kids and elderly alike. When Cameron came to visit my family in Canada several times, he took a special shine to my ailing grandfather and spent the entire time attending to him and making jokes to keep his spirits up. Since then, even years later, Cameron checks in and it just brings so much joy to my grandfather.

Unfortunately, my friendship with Cameron took a turn in 2004 when he no longer communicated with me and surrounded himself exclusively with people who used drugs. His new "family" – as he called them—was a group of fellow drug addicts who took over his life. No one had jobs or responsibilities—it created a world where Cameron was the sole provider and there was an endless parade of sycophants and users. There were several times that I was unable to reach Cameron for such unusually long stretches of time that I would just stop by his house unannounced. It was sad to see someone in complete denial-- anytime I expressed concern, Cameron would tell me that his "family" accepted him and that he felt like these people cared for him in ways that no one ever had. As crushing as it was to see him reject sobriety and embrace this lifestyle, I constantly let him know that his "friends" would not be there for him once he could no longer provide money. Sadly, when he did reach a place of not having access to money, he resorted to dealing drugs and those same people helped him in this business. It was devastating to see him go this low: Cameron had become totally unrecognizable to me.

In closing, I want to say that Cameron views his arrest as a gift in that it may have saved his life. He is truly a "glass half full" person and is able to transform negative experiences into something positive. When I last visited him at MCC, he impressed me with his declaration-- to himself and those around him -- to use this experience as a life lesson to turn his life around. He

sees pleading guilty as a way to take responsibility and wholeheartedly believes something positive will come out of this situation. I see all the old traces of my friend back. He has hope, a glimmer in his eye and plans for the future. I feel that Cameron has a true gift to offer the world. He has the biggest heart of anyone I have ever met in my life. I feel like he has a direction for that love now that he wants to be clean. He provides light and laughter to all those around him. I feel that he can do great things in the world.

I cannot help but see a parallel between Cameron and the subject of the documentary I am currently producing with Spike Lee called "Evolution of a Criminal." It is a look at an African-American teen in Texas who robbed a Bank of America of $150,000. His parents did nothing to stop the crime, instead condoning his thievery and even more shocking, helping him spend the stolen cash. His criminal behavior continued and no one intervened. When he eventually was arrested, he took inventory of his life and he pled guilty. The judge had him serve a reduced sentence and took a chance on him. Since then, Darius got his GED, graduated from University of Texas with honors and recently graduated from Tisch School of the Arts. The film is a look at what made a 15 year old rob a bank, how his parents contributed to his criminal activity, how he took responsibility for the crime and how he turned his life around. I am confident that Cameron has the ability to do the same and share with others the ravages of drug addiction. He has told me that he hopes to help others through his lifelong struggle with drugs and serve as an example. Sobriety can keep him out of the criminal system and I feel that Cameron is committed to a life of being clean.

Sincerely,

Jen Gatien

John W. Rickard

███████████
███████████
███████

March 12, 2010

Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, N.Y. 10007

Dear Judge,

I am writing to you with the hope of convincing you to be compassionate to Cameron Douglas
while deciding his sentence. Most people make the mistake of thinking that growing up as the
son of a movie star is a blessing. I am here to tell you that it is actually the opposite. One would
think that being born to the famous Michael Douglas would mean never having to go without
anything; it doesn't. What I have come to learn through my long relationship with Cameron is
that instead of having an advantage in life because your father is rich and famous, you actually
have an uphill battle to overcome before anyone even meets you. Imagine people resenting you
for your last name before they even know your first name. This is the obstacle that Cameron has
had to overcome his whole life.

I met Cameron in our home town of Santa Barbara through my youth football team at age 10.
Most of the kids on the team picked on Cameron severely because he was Michael Douglas' son,
myself included. When you're a kid, you do childish things like knocking down others who were
more fortunate than you. Cameron was the kid we all wanted to prove was no better than any of
us no matter how rich and famous his dad was. It took me a while to figure out that Cameron
didn't think he was cooler than the rest of us because of who his dad was. In fact, he was
embarrassed by it. He just wanted to be treated like a normal kid, which never seemed to happen.
Wherever he went, he carried the shadow of his father and this preconceived notion that he was a
privileged kid who was stuck up. Once I understood this, I was able to look past the fact that he
was born to a famous family and like him for the person he was. He was someone very similar to
me, only without a mom and dad who loved him and took good care of him like parents are
supposed to.

When we started becoming better friends, it became very apparent that Cameron liked staying
over at my house more than having us go to his place. It didn't take long for me to figure out
why. My family life was very supportive and loving while his was not. His father was never in
town and his mother didn't spend much time with Cameron. Frankly she was not very motherly
at all. Cameron spent more time with his bodyguard Joaquin than he did with both of his parents
combined. Michael and Diandra just did not have much time in their busy lives for Cameron. He
was more of an accessory than a son at the time. Needless to say, Cameron's childhood and
adolescence was not a model of what creates a well rounded and confident man. He was

constantly looking for acceptance and family wherever he could find it. He just wanted to fit in and be loved like all of us do but never had parents that were present long enough to show how much they loved him.

Unfortunately when he was 13, he was sent to an East Coast boarding school where over those very crucial years when parenting can really mold a child, he had to fend for himself once again. I believe this is when he first found a way to fit in and feel normal through drug use. I would see him sporadically during summers and each time he would be experimenting with more and more drugs. It was his way to escape his reality. By the time we were in our twenties and Cameron had become a DJ, it was clear he had an addiction and was very much into drugs. There were times when I would convince him to stop for a while and go on healthy kicks but he would always relapse to his partying ways. The drugs made him feel like he was the star of the show. For those brief periods, he was Cameron Douglas and not Michael Douglas' son. In his late twenties, it was hard for me to hang out with him as he had friends that he called "his family" but they were really other drug users that hung out with Cameron because he could pay for their drug use. They really fueled his problem and escalated it to heroin use. At this point, Cameron was taken over by the addiction.

I have only seen Cameron a handful of times over the last few years and each time, he looks more like a ghost of his former self. No matter how many times I asked him to get help and leave his friends and the drug life behind, he could not. He didn't have the tools from his childhood like I had to be strong enough to overcome insecurities and feel like he can accomplish anything. But then again, I have a family to lean on when I get in trouble. Cameron does not. His family was his drug friends and they didn't want him to stop. His parents never stepped up in a real way to put him back on a clean track. Michael is too busy with his new family which is his second chance at being a real dad. Cameron needs someone to care about him and to give him a chance to be the person he was meant to be.

I know he has committed a serious crime and so does he. I know he will be in jail for a while but it is up to you how long that will be. I am pleading with you to not make an example of Cameron because he is Michael Douglas' son but to see him as the person he could be. He is the best friend I have ever had and is like a brother to me. He has always been there for me when I needed him and is more loving than anyone else I have ever known. He is also a very talented performer and storyteller and I hope that one day we can live out our dream of making movies together. He is just a kid inside who was neglected, without parental love and guidance, like a homeless child left on the street to fend for himself. He wasn't born with a silver spoon in his mouth. I know that with the proper care, Cameron can become clean and be the person I know him to be, and I will be there to support him. Please consider a lenient sentence, which would allow him to be the loving and caring person that he was meant to be.

Sincerely,

John W. Rickard



**Hampton Capital LLC**

515 Madison Avenue   14th Floor, Suite B   New York, NY 10022   Phone: 212 621 8000

Zack H. Bacon III
Chief Executive Officer

March 11, 2010

Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Berman:

I was romantically involved with Cameron Douglas' mother Diandra Douglas from early
1999 until early 2004. We were engaged to be married from 2002 until 2004. Diandra
and I are the parents of two twin boys who were born in March of 2004. During the five
year period between 1999 and 2004 I spent considerable time with Cameron Douglas,
including several family vacations with Cameron, his mother and my two older children,
who were fourteen and nine years of age when Diandra and I first met. Professionally, I
have been in the financial industry my entire career.

Diandra Douglas filed a custody action to have our twin infants raised with her in
California - 3,000 miles away from me - when they were just a few weeks of age. This
suit lasted fourteen months, required me to drop my professional life, move to California
from New York, spend very little time with my two older children, undergo significant
emotional stress and spend a considerable amount in legal fees. After I won this suit,
acquired primary custody of the twin boys and moved them back to New York from
California, Ms. Douglas filed a second custody suit. The objective was to overturn the
first suit and have the children moved back to California where she was living. This suit
lasted nine months, involved a five day trial, was quite expensive, quite emotionally
draining and was fortunately unsuccessful. Ms. Douglas and I are now co-parenting
these twin boys in New York. Cameron's mother and I have obviously had very
significant differences in the past. We may always have significant differences. I have
never met or talked to Cameron's father. I have not seen or communicated with
Cameron since 2005. As such, I have no ax to grind in this case but do, in my opinion,
have a fairly objective perspective on Cameron Douglas.

During the time I spent with Cameron I felt that he was confused in terms of priorities,
somewhat rebellious and occasionally quite angry with his mother. I am certainly no



**Hampton Capital LLC**

515 Madison Avenue   14th Floor, Suite B   New York, NY 10022   Phone: 212-621-8000

expert, but felt that many of these issues may relate to his early childhood.  I also came to feel quite strongly that beneath this confusion was one of the warmest and most giving hearts I ever had the pleasure of spending time around. ██████████████

████████████████████████████████████████████████████████████

████ One evening on Long Island Zack and his sister Isabel arrive at a party to join me.  Cameron, who is surrounded by friends at this party,  sees my children walk in, leaves his friends in mid-sentence,  parts the crowd and walks across the room, gives Zack a high five, a low five, a warm hug, gives Isabel a kiss on the cheek, then drapes an arm around Zack's shoulder, says " Zack, you're the man! ", takes Zack back across the room to his friends, introduces him to everyone, stays with him for much of the party and generally makes him feel like a celebrity.  Instead of the party being a long awkward affair for Zack, it was the highlight of his trip and the smile on my son's face was ear-to-ear.  This was not an isolated incident. ██████████████████

████████████████████████████████████████████████████

████████ with his peer group and remember thinking that some of the ████████ which Cameron tried to reach out to were not the greatest of influences.

Sir, I have but one point to make in this letter – the fellow has got a good heart, a really good heart.  Why his head is so confused is not a matter I wish to opine on.  One could argue that he was unsuccessfully reaching out for attention at a very young age, found that negative behavior got the attention, and never pulled out of the downward spiral which ensued, but that is not an argument I wish to be involved in.

I would argue quite strenuously, however, that there is a lot of good in this young man, that his life could be dramatically turned around if emotional issues and addiction are properly addressed, and that a long period of incarceration, while perhaps appropriate from a legal perspective, would be a very, very sad and tragic outcome from a human perspective.

Sincerely,

Zack H. Bacon III

Patricia Sullivan–Webb



The Honorable Richard M. Berman
United State District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

March 10, 2010

Dear Judge Berman:

I understand Cameron Douglas has pled guilty and will be sentenced in your Court on April 14th 2010. I hope this letter shows you the compassionate and loyal Cameron I have known and loved for thirty one years. I will explain my witness, so you may understand the circumstances in his life that caused Cameron to go so far astray. Cameron thinks of me as an "Aunt" or "Godmother." Cameron is family to me. I love him very much.

It would seem at first glance that Cameron had everything going for him. He was a much wanted child and I was there in the hospital waiting room on December 13th, 1978, the night he was born. Because I started having my children at sixteen, I had three sons when Cameron was born. Diandra and I had surface commonalities such as being American born to a European mother and an American father. However, at 22, when she gave birth to Cameron, Diandra had a striking immaturity about her. She had an unrealistic idea of babies and did not have the maturity for motherhood.

When Cameron was born, Diandra called me many times a day to find out whether all the crying was normal. She told me on many occasions she didn't know it would be this hard and she didn't like being a mother. When Cameron was two and refused to get in her car to go to a birthday party, she threw her purse down to the ground and told me, "I don't like this child; I don't think I even love him. All he wants is his father." And it was like that all through Cameron's young life. Diandra had a fantasy of what parenting would be like that didn't meet reality. The couple's many social and professional obligations became priorities. By the end of year two of their marriage, it was clear to me that the marriage was doomed. Cameron was delegated to a succession of nannies. Diandra had gone back to college when Cameron was a baby and she then decided she would become an actress. The couple had different opinions about where to raise Cameron. Michael found Montecito to be the bucolic life that he dreamed of giving his family, Cameron was happy there, while Diandra hated Montecito and was insistent that the family move to New York City. Diandra wanted a socialite sort of life that was available to her in New York City.

Michael gave in to Diandra's demands, since he was filming many movies and away from home. I can date Cameron's real problems beginning with the move. My third son, James, and Cameron were best friends and my former husband and I had moved to upstate New York so he could pursue writing for Broadway. Diandra would often leave Cameron with us for extended periods

of time—while she was pursuing other interests than parenting. Cameron spent this time with us pretending to be a Webb son. I had four sons by then and Cameron loved being part of a big family. At about age nine, Cameron responded to his mother's frequent absences by over-eating, binge eating. He got fat, I think, to show how unhappy he was. His behavior was noticed by Diandra but she failed to see the underlying cause of his overeating or seek any help for him.

Diandra stated she loved animals and she and Michael were on the boards of several eco groups. But I was shocked when she moved a large, wild ocelot, an endangered animal, into their New York apartment. Diandra fed the cat raw meat. Cam, Michael and I walked around the house in mortal fear. Finally, after biting Cameron and going after Michael, the cat was sent back to the preserve. The wooded floors of the apartment still have remaining marks crippled by the animal. Diandra saw no irony in the fact that she had damaged this majestic wild animal trying to make it her pet. She continued, without regard to her family, to have a succession of exotic animals that were ill-fitted for domestic living.

Another time, despite upsetting Cameron, Diandra insisted that he personally take a dog to be put to sleep prematurely because it no longer suited her aesthetic needs.

On many occasions, Diandra would go out partying, something that upset Cameron deeply. He would beg her to stay home with him. When she did not, I would stay overnight, not as Cameron's mother, but as someone who understood how lonely he felt. I could hear him from the guest bedroom as he hit his pillow and cried himself to sleep.

By age eleven, Michael decided Cameron should go to the same boarding school he had attended. Cameron saw this as being 'sent away' and begged me to talk to his father. Michael told me that if Cameron had a mother like me he could stay home but given the mother he did have, Michael felt he had to put some order put in his life. Soon after going to boarding school, Cameron encountered bad influences from some rich kids at school and began doing drugs. Cameron told me years later, he had been hitting the liquor cabinet at the apartment from age nine. It became clear that Cameron was not experimenting with drugs for fun but to dull his pain.

Cameron began getting into big trouble but Diandra did not alter her life. She continued on as she had, blaming Michael for everything that Cameron did wrong.



Now, why do I know Cameron can and will turn his life around if given another chance? Cameron has his father's loyalty streak. Cameron NEVER forgets a kindness shown him. He is respectful and affectionate to everyone who shows him real caring. When Cameron was arrested, he was consumed with worry about his dogs, who are his companions. Michael had to repeatedly assure him the dogs were being well cared for on a farm. Cameron was fully financially supporting his girlfriend, Kelly, and his good friend, Chris. It was Cameron's sense of responsibility to them that caused him to get himself into such trouble and make the worst choice

of his life. He was so high; he believed the agent was heaven sent to bring him enough money to take care of his 'family', in a way that his immediate family did not do for him.

I am so worried that too much hard time in jail will strip Cameron of his ability to be a productive member of society. Alcoholism and drug addiction runs in the family. However, dealing was simply the desperate act of an addict and is not who Cameron is. He would never harm anyone. The biggest abuse has been to himself.

I beg Your Honor to weigh Cameron's crime with the fact he does have a father who will provide Cameron with any and all help that he needs to beat his addiction. Cameron is not a danger to anyone in society. Cameron has used drugs to blur the images he has of a very lonely childhood, the image of a mother who was too self-involved and uninterested in raising her son. I am afraid for Cameron's safety in prison but more afraid that he will lose his kind spirit and afraid that the drug peddlers will find him and offer him more ways to dull the pain in prison. I am aware that both of Cameron's parents realize the errors they made and will move heaven and earth to help Cameron reach his full potential.

Your Honor, Cameron Douglas is more than salvageable. He has the capacity to live an honorable life. I believe he will if given the chance. I, for one, will be there for him and help Cameron until it is clear he no longer needs help. I am there for the long haul. With six of my children grown, I have the time and will to help Cameron. No mature adults aside from his father know Cameron better than I do. I ask you for leniency from the deepest part of my heart. I love Cameron. I know he has pled guilty. He has done so to spare his family any more agony. I know he is guilty but his worst crime was aimed at himself and done to feed his addiction.

The disease is ugly but Cameron has a beautiful soul. I, again, ask Your Honor to take this all into review when deciding how best to punish Cameron.

Most Sincerely,

Patricia Sullivan- Webb



Ann Dexter-Jones

March 16, 2010

Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York , NY 10007

Your Honor,
I am writing to you to plead for your leniency in the sentencing of my dear friend and for a while
surrogate son Cameron Douglas. I say "surrogate son" because Cameron spent a lot of time in
my home during his pre-teen years. Our families lived in adjoining buildings and were great
friends.  I got to know Cameron's character extremely well. Please allow me to tell you a little
bit about myself and the reason why I feel compelled to speak out on this occasion.

I am a freelance writer, which enabled me to work from home as my five children and two step-
children were growing up.  Ours was definitely a busy household.  I insisted that my children
work one day a week as they could learn the value of feeling good to earn their own money.
They could also learn to respect those less fortunate than themselves by experiencing what went
into earning those extra dollars.  Cameron was always respectful and actually seemed grateful to
keep within the house rules.

I was involved with addiction treatment centers Phoenix House and Caron Foundation for many
years.  Not long ago, I was honored by the Caron Foundation for my work on scholarships for
children whom normally would not have the means or awareness to know of options available to
them.



Children like Cameron become prey to the underbelly of society
who wish to use them by offering them some sort of family or protection that they lack at home.

My eldest son chose to spend a lot of time with Cameron and often went up to the Douglas's
horse farm. He said that Cameron was very kind, sensitive and caring. I noticed that that he could
feel Cameron's loneliness and desire for sibling companionship. For a number of years the two
bonded over many shared interests and commonalities.  My twin daughters also enjoyed the
company of Cameron. My two youngest children were too young to be his peers but Cameron
always had time for them.  It was a pleasure to have him around.

Through all my work with children with addictions, I have witnessed abysmal recovery rates
post-incarceration, which is a constant reminder that we as a society need to treat our children –

rather than incarcerate them. As a parent I truly believe that accountability is important but accountability can and should be achieved through means other than long-term incarceration.

A few years ago I visited Michael and Catherine Douglas and their two younger children in Bermuda. Their household was unpretentious, welcoming and warm. It was an absolute delight to be in their presence. They have obviously put a lot of work, thought and immense love into creating such a household, one that I would think is a privilege for any child to be a part of. It is this kind of environment and family that can surely heal, cure and nurture Cameron of his disease.

I was incredibly impressed with how unspoiled, natural, well-mannered and engaging their young son and daughter were. Michael and Catherine have created one of the most warm, positively functional and nurturing environments for Cameron to understand what a real family life is supposed to be. Their household could only make Cameron thank the Lord and wish to give back to a society that has given him such a chance.

I passionately hope Cameron is given this chance in the near future.

I plead with you, Your Honor, to give Cameron a chance to give back and not to be another wasted soul incarcerated for years, which may undo the lessons he has and is learning now. He had to hit rock bottom to learn, just as my family members did. I see the spark of life, inspiration and natural talent that has always been in Cameron and that caught my attention upon first meeting him. The impression has never left me. Please, I beg that you don't let it die but rather let him use the fear and the knowledge now gained to have a new beginning.

Respectfully and gratefully yours,

Ann Dexter-Jones

***Curtis James Eschardies***



Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

March 14, 2010

Regarding: Cameron Douglas

Dear Judge Berman,

     Cameron Douglas has been more than just a best friend to me, he has been family. I have had the distinct pleasure of knowing Cameron for about ten years now. During those years, Cameron and I have built a special relationship and bond that to this day, is unbreakable and truly genuine. I was introduced to Cameron through my cousin, Chris Lane. Both Cameron and my cousin have been friends since they were kids and attended school together in Santa Barbara, CA. Cameron and I lived together between 2003 and 2005, at which time he decided to pursue his acting career and move from New York to Los Angeles. When we were roommates, our lives were filled with so much love, joy, and happiness. Cameron knew deep down that I was his friend because of the great person he had become, and not because of his family background. To let you know just how close we really are, I have Cameron's name tattooed on my arm.

     I am writing this letter with the hope of displaying the quality of character that Cameron Douglas undoubtedly possesses. It is my wish and plea that the court will show compassion in the sentencing of my dear friend, Cameron Douglas, so that he may receive the proper assistance and treatment he so desperately needs and deserves. I am confident that because Cameron has an unbelievable team of supporters, it will allow him to become a productive and contributing member of society.

     During the last ten years or so, Cameron and I built a bond that goes deeper than just friendship and trust. It's about respect and nobody has it more than Cameron. Respect means more to Cameron than anything else in this world. I think that is what stood out to me the day that we met. He showed me the same amount of respect and attention as he shows to anyone who has had the pleasure of meeting him. Cameron is the polar opposite of some other spoiled and conceited children of celebrities. Cameron thrives on treating people the way he wants to be treated. Every family member or friend of mine who I have introduced to Cameron can attest to his character. One night on Rodeo Drive in Beverly Hills, there was a little girl selling candy on the sidewalk for her school, but nobody even acknowledged her. We sat there and watched people walk past her like she was invisible. Cameron was very upset that all these rich people wouldn't spare a few dollars to help her out. He bought about $80 worth of candy. The little

girl's face lit up like a Christmas tree. Cameron has a real and true sense of generosity. He gives not because he wants to look good in front of others, but because he truly wants to help others.

Cameron has always respected his mother and father, despite the fact that they played a major role in his extended drug use. He valued his parents' opinions and strived to make them happy, especially his father. Cameron has always longed for his father's acceptance. He would always be excited to see and spend time with his family, even though his father missed a large portion of his childhood. When we lived in Los Angeles, we would go to his father and stepmother's house nearby for dinner and hang out with his little brother and sister. Cameron loved and valued his family and took any opportunity to spend time with them. His father loved that he had made the move to Los Angeles and that he was taking his acting career seriously. Cameron would ask his father for advice on how to approach an upcoming audition and they would talk often. From an outside perspective, I think it brought each of them a lot of joy and satisfaction to see the other making an effort to get involved.

Cameron and I had numerous conversations about how our lives would be when we. Although Cameron has endured many personal trials and tribulations in his lifetime, he has always kept a positive attitude and emerged a stronger individual. I have no doubt that he will do the same in these circumstances. He will come out stronger and wiser when this dilemma is behind him.

Since Cameron has been incarcerated, he and I have had several conversations about everything that is happening to him and the reasons why. I can honestly tell you that he believes that everything happens for a reason. He knows and accepts the consequences of his actions. Our short conversations have been positive and I feel like my brother has been given back to me. This situation has given him a second chance and an opportunity to start over and do things the right way.

Your Honor, Cameron is not a person who goes about life carelessly without any regard for others and their wellbeing. Cameron is the type of person who cares and maybe even cares a little too much. Given his background, people publicly state how they feel about him in the media and it is right in front of his face. It is pressure that he has had to deal with for his entire life and it gets to him. I have seen him reading all the horrible things people have said about him and it affects him deeply. All I know is that with the proper help and guidance, Cameron can do whatever he puts his mind to. I know for a fact that I am where I am today, because a judge gave me a second chance to do things right. I took that opportunity and have not looked back. Please give Cameron that same opportunity to once and for all go about and live life in a positive and constructive manner.

Thank you for your time.

Sincerely,

Curtis Eschardies

Marilyn Rickard

March 15, 2010

The Honorable Richard M. Berman
United State District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Youth Football is a "heady" time in a little boy's life. That is how Cameron came into our lives.
He lived nearby and the coach organized carpool so that Cameron would ride with my family.

Cameron was kind of a scrawny kid with a bright, joyful spirit. On the first day, we picked
Cameron up for practice and his family's chauffeur followed us. It was a typical event that put an
unwanted spotlight on a little boy who just wanted to fit in and be one of the guys.

One of my favorite memories of that time was the trip with a car loaded with boys geared up in
helmets, cleats and pads that were bigger than them for their first scrimmage. They quickly forgot
that I was even in the car and chatted away. They showed a great sense of camaraderie. Alas, for
Cam it was not enough. For the next few years he spent a lot of time at our house. Although it
was not a big house, it was always filled with a lot of food and a lot of love. It was as if Cam had
three brothers and one older sister and was surrounded by all of their friends. Many nights Cam
stayed with us. One night I put him to bed in the same room as my son John, sat with them, talked
about the day and kissed them both good night. I felt bad for Cam when he said that the kids only
liked him because he was a movie star's kid. He wanted to be accepted as Cameron.
Unfortunately, that desire continued on and was one of the things that pushed him to rebel.

Parenting is a rough full time job, which Cam's parents could not perform adequately. Diandra
was very young when she met Michael and had Cam. She was raised in a convent with parents
who saw her very infrequently. Michael was trying to prove to the world that he was not Kirk and
that he was even better than Kirk. He did not have a good or loving relationship with his father.

As Cam grew up, I saw him learn to use the very thing he disliked — his being the son of a
celebrity — to get what he wanted. He was so hungry for order and discipline but used his
extremely bright and creative mind to get acceptance and attention. When he was sent to boarding
school in Junior Deerfield, he would call my son John and tell him about the great school. After
many discussions with John and even Michael and Diandra, we agreed to let John attend. I knew
that since he is the youngest of four, John has a good sense of self and he was a leveling factor for
Cam. He would walk away if Cam got too crazy. John did well but was homesick, so he did not
return to Deerfield after his first year. Cam began his downhill spiral at the school and the boys'
time together became limited.

Years later, Michael invited John to work on a movie, Wonder Boys, with Cam. John was at the
University of Arizona but went to work on the movie with the stipulation that he return and
graduate after the movie wrapped. John and Cam had a great experience working together.

Unfortunately when Cameron had a DJ gig in Japan and asked John to go with him, it was not the same experience. A few days into the trip, John called me and said "get me home". He said Cam was going off the deep end and he was unable to stop Cam from going out every night.

The bottom line is that this young man has all the intelligence and creativity to accomplish anything, but he fills his emptiness from childhood with people that use him. I spoke to him about this issue not long ago and he assured me that he was doing fine. I am saddened by the circumstances, but I know that he can be a productive and happy member of society if given the right opportunity. He needs to deal with the consequences of his actions. Even though his parents did the best they could, Cam is still a victim of their lack of experience and knowledge.

Prison is not the answer. I plead, Your Honor, that you give this young man, whom I love, another chance. Like Scripture tells us, there is a season for pruning but it will be followed by abundant fruit if given a chance. Please do not throw Cameron out. I know he will produce beautiful fruit if given another chance in this season of repentance.

Sincerely,

Marilyn Rickard



Geoffrey Akers

Hon Richard M. Berman                                          March 15, 2010
United States District Court for the
Southern District of New York
500 Pearl St.
New York, NY 10007

Dear Judge Berman,

Cameron Douglas is and has been a close friend of mine for twenty years. He and I have a friendship because I was his care taker at a time in his life when he was impressionable. My name is Geoffrey Akers. I live in Chico, California and where I raise my family including my two girls, ages 10 and 13, the same age as Cameron was when I lived at his family home in Santa Barbara. I was there to assist Cameron with any of his needs as a parent figure, but because of our interactions we became best friends, almost like brothers. I helped him with his school work, took him to his athletic games, fed him and cared for him. This created a bond that has never gone away. I may live in Northern California, but because I'm a native New Yorker and have family in Southern California and I was able to see Cameron throughout the years and stay close to him.

Cameron has pleaded guilty and I understand he is to appear before you for his sentencing. I would like you to consider the following in your review of Cameron.

Cameron is a gentleman with a big heart. Every time my wife and I got together with him, he went out of his way to show the strength of our friendship. He always was thoughtful in his actions, which is a character trait everyone possesses. It is this attribute that I feel has led to his current situation. There are many people that befriend Cameron because of his family's achievements, and to use him for their benefit. Please understand he comes from a family that split up at a time when he needed both parents together to help him through his teenage years. Seeing what my kids are going through and what they're up against, I am thankful they have both their parents under the same roof in a loving, caring environment. Cameron was not as lucky. In seventh grade he was shipped off to boarding school 3,000 miles away from his home in Santa Barbara. Now, being a product myself as a boarding school alumnus, I can tell you that being that age without parental guidance takes its' toll on a teenager. Cameron struggled in this environment as many kids do with his circumstances. But he has persevered and has grown into an intelligent, likable guy that has the potential of being a good citizen with a strong future, something that will be much harder if he is incarcerated for years.

I ask your court to show leniency towards Cameron. It will not help him if he is jailed for years and it certainly will subject him to characters that will only weaken his character. If I can assist in any way to help get Cameron back on the track of being a productive citizen, I am more than willing and able to do just that.

Thank you for your time.

Sincerely,

Geoffrey Akers

**Eyal Hen**



March 9, 2010

Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Berman,

Cameron Douglas has been my closest friend ever since I came to New York City from Israel 10 years ago, after serving as a soldier in the IDF. I knew almost nothing about living in the US until I met this outstanding guy, whose generosity and kindness made him seem larger than life. I will explain my witness.

Cameron and I shared an apartment together in 2003 because we shared the same passion – music. I could not help but notice the strong yearning that Cameron had for proving his abilities to the world and becoming an accomplished person in this life. One cannot ignore the fact that he grew up surrounded by fame and glory, which pushed him to establish a career of his own. His great ambitions and talent for creating music both impressed and inspired me.

In the one and half years that I lived with Cameron in Manhattan, I got to know him very well. We did everything together and shared everything from celebrating our birthdays to sharing our most personal moments and issues. Cameron has always been there for me and I could trust him with my life.

Cameron has always taught me to "never stop trying and be the best you can" and to always help others. One good example is when I had lost my one year old puppy while vacationing in the Hamptons. After looking for him for hours, I was distraught and was afraid that something had happened to my dearest puppy that I love so much. Cameron never stopped believing that we would find my puppy. As the night went on and I was in my room crying non-stop like a child, Cameron entered my room, with a huge smile on his face, holding the lost puppy in his hands like a hero. He had never stopped looking for the puppy when I had given up. I have always admired Cameron's perseverance and kindness.

I have also witnessed Cameron's loyalty and dedication to his loved ones. He arranged to go to LA the minute that he heard his grandfather was ill. Cameron went there to care for his

grandfather and make him happy through difficult times. Cameron always wanted to make the people he loved happy. His kindness and the fact that he comes from a rich and famous family are sometimes exploited by people who saw an opportunity to take advantage of him.

I know that every person can choose his own way of life, but I think Cameron's kindness and his openness backfired. This addiction led to an out of control spiral of events. His addictions made him choose to trust some of the wrong people who took advantage of him.

Cameron at one point needed help beyond what the people around him could provide. He needed rehab. However, he was caught in a whirlwind. We all know it takes a long time to have a loved one committed to rehab both physically and psychologically. I know that his parents and anybody who really knows Cameron would help if given the opportunity because we know it would be a great loss not to have his great personality and kindness around us. Cameron is a very good person that will never want to harm people if it's up to him.

I imagine that Cameron did what he did due to his strong addictions to drugs that had gotten worse over time. He did not get the proper help that he needed and his vulnerability allowed people to take advantage.

Cameron Douglas can be a great benefit of society if only he can be given a second chance to live as one should live -- clean and worthy.

Judge Berman, I know Cameron regrets very much what he has done. I know that by actually taking him from where he was probably saved his life. However, in order for him to be free from this horrible "disease" of addiction, he should be given the proper treatment that he needs. Please give him the chance he never had before to get back to his normal and vital life.


Sincerely,


Eyal Hen

**Jelinda DeVorzon**

███████████████

███████████████

March 25, 2010

Honorable Richard M. Berman
United States Court for the
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Berman:

I am writing on behalf of Cameron Douglas. My name is Jelinda DeVorzon. I reside in Santa Barbara, California. I am happily married and have three wonderful sons. I am active in my community and involved in many philanthropic endeavors, including the recent campaign for the rebuilding of our local hospital.

I met Cameron's parents, Diandra and Michael, a few months before Cameron was born. We became good friends, and our families saw a lot of each other. I have many wonderful shared memories as our boys were growing up. During Cameron's earlier years, I remember being at the Douglas home for bar-b-ques, tennis and swimming, and Cameron was always such a sweet and easy-going child.

Cameron has a special place in my heart because from the time he was born, he has always touched me with his gentle soul. He is a kind, thoughtful and sensitive person. He never took all his blessings for granted, and always seemed happy and joyful around his family and friends. He related to everyone without being judgmental and seemed oblivious to his father's fame. He was popular with other children and about one of the cutest, most loveable kids in town. I felt a real closeness to him, and I could tell that he knew that I cared about him.

I once told Cameron that if he ever needed me, that I would always be there for him. One day, there was a knock on my door, and there stood this little boy, out of breath from riding his bike. He said, "Jelinda, you told me if I ever needed you, you would be there to help me. Well, I can't make it up the hill back to my house. I am too tired and the hill is way too steep. Could you please drive me home". I can still vividly remember how he looked and I couldn't decide whether to laugh or cry… he was so sincere, honest and downright adorable. Needless to say, I drove him home.



I saw Cameron about a year ago in Los Angeles, and he was still the charming, warm and friendly young man that I remember from his childhood. He seemed to be doing well and that made me happy... obviously that was not the case.

I humbly and respectfully ask that you show mercy and compassion to a young man who has made the wrong choices in life, but I believe, given a chance, has the potential to be a productive member of our society. I believe in Cameron, and, if we just don't give up on him, I know he will chooose the right path and live a productive, drug-free life. Thank you Judge Berman for taking the time to read my letter.

Sincerely,

Jelinda DeVorzon

Isaac Barba

███████
███████
███████

March 22, 2010

Honorable Richard M. Berman
United State District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge,

Cameron Douglas and I have been friends for fifteen years. I have grown in many ways with my brother Cameron. We were in a dance group together when we first met. We surrounded ourselves with kids of the same talent. For as long as I can remember he and I always had a passion for dance and music. As we got older, Cameron became a well known DJ. and I became a lyricist. We share a lot in common with our upbringings as well. Our fathers were not present. We both agreed that not having a father in our lives made us search for male guidance from our peers. We turned to music as a positive outlet.

I grew up in Santa Barbara, California. Homeless at an early age, but by age 8 I was attending public school and living with my godparents. I have been a drummer since Junior High which led me into a life of music. After High School I went straight into the working field, and continued to perform as a lyricist. I got married at age 25 and now have a seven year old and live in Carpinteria with my wife and son. I work as a caregiver providing in-home care for disabled individuals.

Cameron and I share a lot of the same friends but I was one of the few that kept in touch with him after he moved to the East Coast. I only heard and saw good things about him while he was there. We would meet every time he came into town, two to three times a year, and we would always dance. He even flew me to New York and Switzerland to perform with him. Cameron has always been like a brother to me and a very helpful and close friend. He was a groomsman at my wedding and is like an uncle to my son. He was close with my mother too. When she passed away four and half years ago, I did not have enough money for the arrangements. Cameron was thoughtful enough to help me cover the expenses.

Cameron has a very big heart and always does what he can for others. He is definitely one of the most kind-hearted people that my family and I have come to know. We love him. I know that Cameron has learned his lesson. His intent was never to harm anyone. If given another chance I know he would make the most of it. He is not a criminal. He is a compassionate human being with a problem that can be solved with a little help. I am asking you for that help. Please send Cameron home so he can receive the help he needs. He does not need to be locked away, he just needs help finding direction with all the love that he has.

Thank you,

Isaac Barba

Isaac N. Barba

March 30, 2010



The Honorable Richard M. Berman
Judge of the United States District Court
    for the Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Berman:

I am writing to you on behalf of Cameron Douglas, who will be
coming before you for a final determination on where he will be
spending the next years of his life. The crime Cameron has been
involved in that has led him to you deserves an honest and
appropriate sentence. I would ask for and expect nothing less.
However, my reason for writing this letter to you, Judge Berman, is
that I hope and pray in Mr. Douglas' case that he is sent to a facility
that will be intense and harsh, but will focus primarily on education
and rehabilitation.

I have known Cameron and have welcomed him in as a part of my life
for over 25 years. If you would permit me to, I ask you to please give
me a chance to shed some light on an individual who got caught as a
victim of substance abuse combined with involvement with the wrong
peer group. Cameron became addicted to drugs and a lifestyle with
people that led to the poor choices and the consequences he faces
today. He got drawn in and could not find a way out. Cameron today
is not the same person he was when I spent a lot of time with he and
his family. Cameron was a gentle, fun, affable young man who truly
cared about you and the people he met. This substance abuse
lifestyle started when he was a teenager. Cameron spent many days
and nights high, disconnected from those he loved and truly cared
about because of his drug abuse and isolation.



The Miami HEAT
AmericanAirlines Arena
601 Biscayne Boulevard
Miami, Florida 33132
(786) 777-HEAT



March 30, 2010
Page 2

When I was coaching the Lakers in the 80's, Cameron and I often talked about sports and the big dreams he had as a young man. He was amazed at the level of talent that NBA players had. I often told him that it was much more than just talent; that a tremendous amount of hard work went into it as well. Cameron was a willing worker if he could find something he loved. Music became his passion and he worked very hard at it. You never know where that tap root of success or failure takes hold in a young man but it is an absolute shame that a foundation of alcohol and drug abuse followed Cameron for so many years while he was also trying to rid himself of this behavior and disease in counseling and rehabilitation.

I recall one time when my son needed a summer of growth and Cameron told him of this survivor wilderness program in Idaho where he had spent some time. He convinced my son that this would be a worthwhile experience for him. To this day my son says it was the best and most growing time in his life and gave him a tremendous feeling of self confidence he so desperately needed.

I beg of you, Judge Berman, for leniency when you sentence Cameron. I have been coaching and teaching young men for over 30 years and have had many come before me with a myriad of problems borne out of hellish experiences and situations in their life that created personalities, behaviors, and abuses that needed professional attention. I would always try to find the right person, place, and people to help with this process leading to change.

Until the right teacher can change people like Cameron in the way they think, the way they do things, the way they live their life, and the way they relate to society, those things will never change. They need help. Cameron needs help. He needs a place that will lead him to change his ways and become a substance abuse survivor and possibly an educator of what he has experienced in his life to help others.

March 30, 2010
Page 3


Cameron has spent the past nine months in prison, and this has led him to being sober for the first time in many years. For me, being around successful people who have been given 2nd, 3rd and 4th opportunities because they finally "got it" and made the changes necessary to becoming a viable productive person relating to the laws of our society has been rewarding.

Please give Cameron Douglas the chance to spend the next years of his life in an educational rehabilitation facility. I know in the bottom of my heart that he can become a valuable, responsible, positive person in society. One person can make a difference in directing this change. "One chance, zero tolerance" for a new life. I believe Cameron Douglas is ready, wants to be successful, and will be successful in his fight with drug addiction. Cameron is not a criminal. His criminal behavior cannot be tolerated and should bear consequences. I ask for mercy, Judge. Can we please save this "ONE".

Sincerely,

Pat Riley
President

Stuart Sundlun

March 10, 2010

Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Berman,

My name is Stuart Sundlun, I am 56 years old and the Managing Director of BMB Advisors Ltd,
a financial asset management firm which focuses on investing in private companies in the
emerging markets backed by some members of the royal family of Brunei. I have been in the
financial markets for 30 years, and previously worked at Chase Manhattan Bank and Lehman
Brothers. I graduated from Harvard University and received an MBA from Columbia
University's Graduate School of Business. I grew up in Washington D.C.

I have known Cameron since he was born. I have been a friend of his mother, Diandra, since she
was a freshman at Georgetown University. I had attended her and Michael Douglas' wedding.

During Cameron's childhood, I saw him when I would visit the Douglases in California which
was usually once every year or so.  I saw him more frequently when he was working in his late
teens and early 20's as a DJ. I would see him either in Santa Barbara at his mother's home when
I visited, or in New York where he was living.  He had a great talent for music and received a lot
of jobs as a DJ both domestically and internationally.

Cameron was and is very kind. He was always loyal to his friends and seemed to be the leader of
whatever group of friends he was with. He was charming, convincing and had a certain presence.
He loved animals and always had a dog who he loved.

He is a good conversationalist who makes you feel important since he always asks about what
you are doing and is genuinely interested. From my observation, that interest in the activities and
feelings of others is what I believe made him the leader of his group of friends as a teenager and
young man in his twenties.

Cameron was very talented as a DJ. I remember the pride he took one night when I went with his
mother to hear him spin at the Limelight. Between sets, he introduced us to all the people
working at the club and gave us a tour of the control booth proudly showing off the controls
which looked to me like the complex control panel of an aircraft.

He had a difficult father image to live up to as Michael was and is extremely successful and high
profile as an actor and producer. I am sure this father's image, the time requirements of

Michael's career and the travel demands created some deep insecurity in Cameron and feelings of abandonment. I know a little about having a strong father image and the benefits and difficulties of such a relationship. My father was a tough personality as a lawyer, business man and eventually Governor of Rhode Island (1990-1994).

As an actor, Cameron did not have the success of his father and I am sure that bothered him. In addition, his insecurities led him to personal drug and alcohol use which eventually led to heroin use and addiction. Once he became addicted to heroin, which I believe he has been for the past seven years or so, his life and his actions became self-destructive. This is his tragedy. He has hurt himself the most as a result of his addiction. Obviously, his judgment was terrible which led to his crime and subsequent guilty plea.

Though an addiction is not an excuse for breaking the law, I truly feel knowing the tender, warm and caring side of Cameron, that if he is able to break his addiction to heroin and become clean and sober, I know he can channel his considerable energy and talents toward a productive life, probably in some aspects of the entertainment business.

I know he realizes that he must change the path in his life, take responsibilities for his actions, and redirect his considerable energy toward becoming productive without the use of drugs. He knows he has hit bottom.

I believe his time in prison can be used to become physically healthy and mentally improved with a sense of purpose which will allow him to return as a productive and positive member of society.

Consequently, I would ask that he be able to get the best treatment possible for his addiction in prison and that he receives as short a sentence as possible which will fairly weigh the punishment required by society with Cameron's potential contribution to it upon his release.


Sincerely,

Stuart Sundlun

Adam Kimmel

████████████
████████████████

The Honorable Richard Berman                                    March 24, 2010
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Berman,

I am writing to you to ask for leniency in the sentencing of my good friend, Cameron Douglas. I have known Cameron since the age of 12: we were classmates at Eaglebrook School, and lived in the dormitories together. By way of background, I am a clothing designer and founded my own clothing company that focuses on menswear designs. I live in New York City and just had a daughter who was born this past December.

Cameron and I became friends due to the circumstance of our common interests. We played sports together, lived across the hall from each other in the dorm, and would return to our parents' homes in New York City together. When Cameron left Eaglebrook, his family moved to California, during which time we were out of touch. We reconnected during my senior year at NYU: Cameron was living in New York again, and was on a great path. He was working on a film and was positive, ambitious and charming as hell. We have stayed in touch over the years, and while we did not speak much over the last two years, we have reconnected since he has been in prison.

One thing that I think is important for you to know about Cameron is that he is an incredibly generous person and has always treated anyone he has come across with utter kindness. A very small example: I remember in 2001, Cameron invited me to a film festival in the Czech Republic where his movie was screening. They sent a car to pick us up at the airport. When the car arrived, Cameron left me in the back seat and sat up front to keep the driver company, to talk to him and essentially make him feel at ease. That was typical of Cameron—he always wanted to make everyone around him feel included, comfortable and happy. Most of the kids I know with privileged backgrounds don't typically treat other people with even a quarter of the respect that Cameron shows. He always wants to be good to others. It is his nature—he is fundamentally a good person.

Cameron is also incredibly loyal and always stayed loyal to his friends. Unfortunately, some of the kids he was friends with in high school weren't the best of influences. In my view, they dragged Cameron down, but it was Cameron's principle of loyalty that led him down their path. It was my impression that some of these friends took advantage of Cameron's kindness. Since I lost touch with Cameron for a while, I don't know what actually happened. When I met Cameron two years ago for coffee, I could tell that he was trying to figure things out for himself but also remember thinking that his friends were dragging him down.

I have talked to Cameron since he has been in prison. I see that he is off of drugs and has clarity that has brought him back to his old self. I'm writing this letter because I truly believe that if he had a fresh start, he can do a lot of good. He is very creative and talented, and has a lot of potential. I look forward to having my friend back and being there for him as he starts a new and sober life. I hope that you will give Cameron this opportunity.

Sincerely,

Adam Kimmel

.

# KIRK DOUGLAS

March 5, 2010

Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Honorable Judge Berman,

I am Cameron Douglas's grandfather. I have known him all of his life.

Cameron was always a pleasant guy who cared for others. It was a surprise to me when he got in trouble. It wasn't a surprise to me to find out that Cameron had natural talent as an actor. I remember when he played a part in the movie with me and Michael. He was a natural. We were so proud.

Before making movies, Cameron supported himself by being a disc jockey. I had to find out from him what a disc jockey was.

I traveled from Los Angeles to New York City to see Cameron (at 93, that's a long trip). I was gratified to see how well he was taking his incarceration. He had no one to blame but himself. He didn't express any self-pity, nor did he ask for any. The only sorrow he expressed was for the trouble he had caused others.

One story that I will never forget, happened when Cameron was much younger. He was confused because his grandfather was Jewish and his grandmother was not. He asked his father, "Dad, what are you?" His father answered, "I'm half Jewish." Cameron replied, "Well, what am I?" His father said, "You are a quarter Jewish." Cameron tried to assimilate that and said, "Dad, I want to be half Jewish."

Of course, as his grandfather – by the way he calls me Pappy (never Grandpa) – I am prejudiced. But Cameron, was always fun to be with and well behaved. I was shocked when he got in such a mess. I am convinced

that Cameron could be a fine actor and a person that cares for others.  I hope I can see that happen before I die.  I love Cameron.

Respectfully,



# I N D A B A
### F I L M S

March 21, 2010

TO: Honorable Richard M. Berman
     United States District Court for the
     Southern District of New York
     500 Pearl Street
     New York, N.Y. 10007

Your Honor,

My name is Jeff Kanew, and I am writing you regarding Cameron Douglas. I have been a friend of the Douglas family for almost thirty years, ever since I directed Kirk Douglas in a film in 1982. I had a few social encounters with Cameron, at Douglas family functions, and I always found him to be a sweet, polite, and intelligent young man.

In 2003, I was directing a film called "National Lampoon's Adam And Eve." The screenplay was written by my son, Justin, and it was largely autobiographical. After watching Cameron's work in his first film, "It Runs In The Family", my son and I both agreed that Cameron Douglas would be a perfect actor to play the main role. My relationship with Kirk and Michael helped that casting idea to become reality, and we produced the film later that year.

My two month experience with Cameron was completely positive. He was talented, cooperative, and, most important, a good person. He did his work responsibly, and interacted well with the other actors and crew people. This is not often the case with movie stars. I would have worked with him again enthusiastically, had the opportunity arisen.

I didn't have a lot of contact with Cameron over the next few years, but I heard a few stories about his having some problems with substance abuse. I knew he was working as a sought after Deejay, which involved nightlife and lots of travel, and I imagine exposure to whatever substances are found in that world, but I personally never saw any evidence of that when he and I did interact.

I am not sure I am qualified to discuss the reasons a young man might succumb to drug problems, but I would guess that the pressure of living up to a father and grandfather who were both extremely famous and accomplished stars is daunting. It might cause a person to feel unworthy and that might invite self destructive behavior. Also, his parents' marital problems and divorce was likely another factor in any poor choices he has made. ████████████████████████████████████████████████████████

While I understand that he has broken the law, I know he has acknowledged his wrongdoing and I think he may be ready redeem himself. I realize there may be some incarceration required by his guilty plea, but I hope you can put yourself in the place of a father with a troubled son, and be merciful. Sobriety and therapy are what he needs more than punishment. I think society will benefit if this bright, talented and good-natured young man is allowed to heal and make a contribution.

Thank you for your consideration.

Yours truly,

Jeffrey Kanew

March 5, 2010


Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Honorable Judge Berman,

I am Cameron's step-grandmother but I have known Cameron all of his life
and found him a very caring and intelligent young man.

I was born in Europe and my husband and I have been married for 55 years.
Our life has been interesting, exciting and all and all, we've had a wonderful
time together.  We had two boys. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮


Cameron stayed many times with us at our home ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

In Cameron's latest involvement, I believe that he has learned his lesson even if it was the hard way. He is ready to move forward now towards a happy and productive life for himself and for his family.

Thank you, your Honor, for listening to my story.

Joanne Spuches


March 12, 2010

Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, N.Y. 10007

Your Honor,

I was Cameron's First Grade teacher.  He was a sweet six year old boy who was thrilled to
learn to read, and loved having play dates with his friends.  Cameron was a kind, good friend
to everyone and everyone loved Cameron.  He was a pleasure to have in class.  Cameron
loved Music class and took violin lessons.  I attended every concert and loved the way
Cameron always looked for me in the audience.  My father died in 1986, the year I taught
Cameron, and Cameron wrote me a long letter, telling me how very sorry he was I lost my dad.
He was a 6 year old child, capable of deep sympathy for me after having lost my father.
Cameron told me he wanted to meet  my sons, whom I spoke about often in class.  His driver
would bring us both to my apartment after school on occasion and Cameron would chat with
my sons.  In my classroom, the parents thought of Cameron as a celebrity, but to Cameron my
sons and I were the celebrities.  He was thrilled when my son, Chris, gave him a shirt. He
liked it so much that he wore it over his uniform every day for two weeks, telling everyone
proudly that Mrs. Spuches' son gave him the shirt.

Cameron was at the school for a few years and then the family moved to Santa Barbara.  I
missed him and often wondered how he was doing.  Years went by and when Cameron was a
teenager, he stopped in at my school to say "hello".  I wanted to ask him so many questions,
but I did not have the opportunity.  Did he like his school, was he still into music, did he have
any plans for college….?  Then a few years later, my son, Tim, called me from his club and
told me he was putting someone on the phone who was working at the club that night and who
wanted to talk to me.  It was Cameron!  I was thrilled.  He told me he never forgot me and he
was so happy to be hooked up with my son, Tim.  He took my number and said he would call.
I did not hear from him, but I was not surprised because Tim told me he was using drugs.  I
felt very sad hearing this, and felt sad every time I read about it in the papers.

Cameron is a good, kind person, your honor.  I love Cameron, my sons love Cameron, and
students who visit me every year always ask if I have seen Cameron.  They remember him as
their loyal and trustworthy friend.  He is not a violent person and he cares about others.  He
has made some very poor choices and I know he must pay for that.  The environment in which

he chose to live impacted greatly where he is today.   He got mixed up with the wrong things and lost his way.  He needs to be clean. When he is, I know he has the potential to be a successful man, with the confidence he has sorely lacked in his life. I wish that he had been in a very serious facility, getting proper help to conquer this addiction.   Cameron is a young man, your honor, a gentle good-hearted, kind young man.  I have been a teacher for 30 years and I would never be insincere when I am asked to make judgments on the character of a student.   I feel that although Cameron does need to pay for his crime, a long prison term would be a harsh sentence.  What a shame it would be to see a decent human being become ruined by spending a lengthy time in jail when he has the potential to become the person he really is deep down, a person who cares about others, a warm, generous person who hasn't a mean bone in his body. Please give him a chance to lead a productive, happy life, doing good things for himself and others, once he is free of the addiction.

Sincerely

Joanne Spuches

**CATHERINE ZETA-JONES**
**MICHAEL DOUGLAS**

Honorable Richard M. Berman
United States District Court of the
Southern District of New York
500 Pearl Street
New York, NY, 10004

Your Honor,

My name is Catherine Zeta-Jones.
I am Cameron Douglas' step mother.
I have been married to Michael
Douglas, Cameron's father, for ten years
in November 2010. Although, I have known
Cameron for twelve years.

As a mother to Cameron's half
brother and sister, Dylan and Carys,
I have seen Cameron be an exceptional
brother to both & true brother to them,
always showing a commitment to them,
and in return adoration for their
brother, from Dylan and Carys.

Never, in my experience, over the
years, has Cameron shown any sign

**CATHERINE ZETA-JONES**
**MICHAEL DOUGLAS**

of the disease, that had tormented
him, toward his siblings, or has
ever been abusive to us as a family
at any time.

I use the word "disease". My
stepson is a, caring, considerate
worthy human being, but never the less,
the disease, that for years, he has
tried to combat, did take over again.
What is wrong, is wrong, but may
all these positive attributes prevail,
so that a facility that he is positioned
in, will help rehabilitate him

With my regards,

Catherine Zeta-Jones

Diandra De Morrell Douglas



March 30, 2010

The Honorable Richard M. Berman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Esteemed Judge Berman,

As Cameron Douglas's mother, I can tell you that this is the most painful letter I've ever had to write. I am writing to you to plead for leniency in your sentencing of my son, the only blood relative I have left in this world.

I do not envy your task of having to pass judgment on individuals who come before you having committed a crime. I firmly believe that inmates—including Cameron-- came into this world as innocents, without the words "MCC" written across their little brows. It is their families and experiences that mold their actions. I hope that this letter will shed some light on who Cameron is as a person, and why he may have done what he has pleaded guilty to, and why he deserves a second chance.



I married Michael Douglas when I was 19 years old. I was at that time a student at the Georgetown School of Foreign Service, and the world of Hollywood was completely foreign to me. I was the daughter of an American diplomat and a European mother who piloted planes and sailed boats. I grew up in Mallorca, Spain among diplomats, artists and intellectuals, far from the glitz of Hollywood. Growing up, my parents favored books, intellectual conversation, and politics over a TV set.

In marrying Michael so young, I was deliberately leaving behind a scarred childhood. My parents separated when I was six. My father served as a young Captain,

whose uncle was Admiral George P. Luker in charge of the remobilization of Europe after WWII, in the U.S. Navy and was injured during Pearl Harbor. 

After Michael and I married, we moved to Los Angeles where he was pursuing a career in film. Cameron was born a year later. He was a sweet and sensitive child, the love of my life.

Michael was older than me by over a dozen years, and our social circle was made up of other prominent Hollywood actors, producers, and magazine publishers his age. I was out of my element, to say the least, and quite green. I can admit, as I already have to Cameron, that I was not as wise as I should have been when it came to raising him due to my young age. I can only say that I did the very best I could at the time with the tools I had available to me as a young mother.





When Michael Douglas, Cameron and I moved to California, I researched schools for Cameron to attend. Rather than the well-regarded high schools I had found for him, Cameron chose to attend the poorly-rated high school at which gang activity was prevalent, it struck me as a rejection of the life we wanted him to have. I remember thinking that Cameron chose that school to assuage his lack of self-esteem issues: at that school, he would not have to live in the shadow of his father and grandfather, as he would at other schools. I was nonetheless against the decision.

The school did not provide the best of influences for Cameron: it was where he met some of the friends with whom he would abuse drugs through much of his adulthood. Even though he was a bright student, Cameron did not graduate from high school, though he did pass his high school equivalency exam.

I was insistent that Cameron attend college: I always tried to instill in my son that while looks, youth, and fame are fleeting, only knowledge and the love one holds in one's heart can never be taken away. It was my position that if Cameron did not go to college, he should be required to financially support himself.

Cameron abandoned any desire to go to college and remained in New York without any life skills he could use to secure his own path or income to support the lifestyle he was accustomed to throughout his life.

It was shortly after the demise of the club deal that I noticed Cameron's life deteriorate. His disease of addiction started taking over his life. I felt as though I saw him slipping away. Cameron returned my calls less and less frequently, until he would take months to call me back. The quality of our conversations changed as well: they were exceedingly brief, and Cameron seemed to avoid any emotional topics. I would hang up the phone and tell myself, "I am losing my son."

Over time, it became clear to me that Cameron was sabotaging his own life. He was using drugs to ease his pain, and was risking his life in the process. When he wouldn't return my calls for extended periods of time, I would go visit him at his

apartment unexpectedly. What I found broke my heart: my once ebullient son would be splayed on the couch, obviously strung out, watching TV. The apartment was a complete mess, and his friends and girlfriend would also be strung out, oblivious to my presence. My attempts to get Cameron to rehab and pleas for him to see a drug interventionist were unsuccessful. Sadly, this had become my son's life. His father and I agreed to deprive him of money that could further the habit that was slowly killing him.

I must admit that my immediate reaction when I learned of my son's crime was one of guilt. I have always instilled in Cameron the values of loyalty and looking out for those who have less. I believe that it was a skewed sense of both that led Cameron down the unfortunate path that ended here: the people that surrounded Cameron relied on him for their drug use, and he took unthinkable means to make sure that he and his friends could use. It was jarring—and heartbreaking—to see the lengths that Cameron would go to for his addiction and that of his friends.

Cameron's arrest has brought all of us life lessons, most of all Cameron. As painful as it is for a mother to watch her son go through an ordeal such as this one, it is a blessing to have the son that I know and love back in my life. For the first time in a long time, I see my son enthusiastic about his life. I have told Cameron to use this time to dream a dream that will truly fill his heart, not what others expect his dream to be. I know my son is capable of achieving a fulfilled life, and he is certainly worthy of one. I know in my heart that given a second chance, Cameron can leave the world a better place than the world he came into.

Your Honor, I know that I have not always been a perfect mother, but I can tell you I that have learned over time to find my voice and be a better one. I am thrilled at the possibility of welcoming Cameron back into my home. I have prepared for this event by bringing his younger siblings with me each time I visit him at MCC. They love their big brother Cameron, and tell me that they are giving all of their love to him until he gets to come home. Through these visits, and our letters and phone calls, we have reconnected the bond that was broken by years of drug use. I finally feel as though I have my son back.

Cameron's character, his humility, and his heart are all bigger than his circumstances. I am certain that he is prepared to start a new life, and in doing so he can be an inspiration to others who have suffered. I humbly beg you to give him this opportunity.

Respectfully yours,

Diandra De Morrell Douglas

Robert B. Millman, M.D.



March 30, 2010

The Honorable Richard Berman
United States District Court
for the Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Berman,







Sincerely,

Robert B. Millman, M.D.

3

Robert B. Millman, M.D.



February 8, 2010

To Whom It May Concern:







Sincerely,

Robert B. Millman, M.D.

Robert B. Millman, M.D.



January 26, 2010

To Whom It May Concern:







Sincerely,

Robert B. Millman, M.D.

2/5/2010

2/5/2010

PDS Print All Documents

2/5/2010







February 4, 2010

To Whom It May Concern:

