REDACTED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | 09 Cr. 1082 (RMB) |
| CAMERON DOUGLAS, | |
| Defendant. | |

### SENTENCING MEMORANDUM ON BEHALF OF CAMERON DOUGLAS

**DE FEIS O'CONNELL & ROSE, P.C.**
**500 Fifth Avenue, 26th Floor**
**New York, New York 10110**

*Counsel for Cameron Douglas*

# TABLE OF AUTHORITIES

## CASES

Gall v. United States, 552 U.S. 38 (2007) ................................................................ 10
Kimbrough v. United States, 552 U.S. 85 (2007)...................................................... 11
United States v. A-Abras, Inc., 185 F.3d 26 (2d Cir. 1996) ...................................... 19
United States v. Booker, 543 U.S. 220 (2005)..................................................... 10, 11
United States v. Brady, No. 02 Cr. 1043 (JG), 2004 U.S. Dist. LEXIS 589
    (E.D.N.Y. Jan. 20, 2004) ...................................................................................... 19
United States v. Cavera, 550 F.3d 180 (2d Cir. 2008)............................................... 19
United States v. Collado, No. 07 Cr. 1144 (HB), 2008 U.S. Dist. LEXIS 44010
    (S.D.N.Y. June 5, 2008).......................................................................................... 19
United States v. Crosby, 397 F.3d 103 (2d Cir. 2005)........................................... 10, 11
United States v. Maier, 975 F.2d 944 (2d Cir. 1992)...................................... 17, 18, 20
United States v. Pope, 554 F.3d 240 (2d Cir. 2009) ................................................. 19
United States v. Williams, 65 F.3d 301 (2d Cir. 1995) ............................................. 17

## STATUTES

18 U.S.C. §1791 .................................................................................................. 2, 9, 16
18 U.S.C. § 3553(a). ..................................................................................... 11, 15, 18, 20
18 U.S.C. § 3559(a)(3)................................................................................................ 19
18 U.S.C. § 3561(a) .................................................................................................... 19
18 U.S.C. § 3563(b) .................................................................................................... 20
18 U.S.C. § 3583(d) .................................................................................................... 20

## SENTENCING GUIDELINES

U.S. Sentencing Guidelines Manual ch. 5, pt. B, introductory cmt............................. 19
U.S.S.G. § 3E1.1(a) .................................................................................................... 10
U.S.S.G. § 4A1.1 (c)................................................................................................... 10
U.S.S.G. § 5K1.1 ......................................................................................................... 7

## OTHER AUTHORITIES

*'Drugs in Bra'*, N.Y. Post, Oct. 5, 2011 ...................................................................... 8
*'Singing Role for Cameron'*, N.Y. Post, Feb. 12, 2010 ................................................ 6
*Cameron Douglas Back in Court – as a Star Witness*, People, Oct. 5, 2010 ................... 8
*Cameron Douglas Named as Potential Government Witness in NYC Drug Trial*, N.Y. Post,
    Sept. 27, 2011 ...................................................................................................... 8
*Douglas Son Set to Sing*, N.Y. Post, Jan. 15, 2011 ....................................................... 7
Federal Justice Statistics Program, Bureau of Justice Statistics .................................. 13
*Kirk Douglas, Catherine Zeta-Jones pen letters in hopes of helping Cameron Douglas skirt jail*,
    N.Y. Daily News, April 4, 2010........................................................................... 6
Office of the Inspector General – Evaluation and Inspections Division, U.S. Department of Justice,
    The Federal Bureau of Prison's Drug Interdiction Activities (2003) ..................... 12, 13

## PRELIMINARY STATEMENT

On behalf of Cameron Douglas, we respectfully submit this Sentencing Memorandum pursuant to Rule 32 of the Federal Rules of Criminal Procedure.[1]

While this is the same defendant who was sentenced by the Court in April 2010, we note at the outset that the conduct presently before the Court – possession of a user quantity of drugs in jail – is vastly different from the drug dealing that was the subject of the earlier sentencing. Secondly, we inform the Court that the defendant has already been punished quite severely for this conduct by the Bureau of Prisons ("BOP"). This punishment includes the loss of 80 days of Good Time Credit, loss of family visits for two years and confinement in so-called "Disciplinary Segregation" for nearly one year. Indeed, a prison consultant describes these sanctions as "draconian" and unlike those levied on other inmates who commit similar violations. Ex. 1 at 17. Finally, we note that the punishment imposed by the BOP will not only prolong his prison sentence but also postpone, perhaps indefinitely, the defendant's participation in a prison drug rehabilitation program. Tragically, as indicated at the defendant's allocution, he was on the verge of getting into a treatment program at the time of his guilty plea.

We respectfully request that the Court impose a sentence commensurate with the nature and likely cause of the new offense. Additional jail time is not needed to promote respect for the law or to cure this defendant. Rather, we urge the Court to impose a sentence that will permit the defendant to get into a treatment program at the earliest opportunity.

---

[1] Given the Court's familiarity with the case and the extensive prior sentencing submission, we are not re-filing materials that are already part of the record and are limiting the number of exhibits to this Memorandum. Pursuant to our November 22, 2011 teleconference, we list the specific, previously submitted materials to be considered with this memorandum: 1) February 1, 2010 Letter to Judge Berman from Counsel for Cameron Douglas regarding bail; 2) Sentencing Memorandum submitted on April 5, 2010 on behalf of Cameron Douglas; 3) April 6, 2010 Letter to Judge Berman from the government pursuant to U.S.S.G. § 5K1.1; 4) April 7, 2010 Presentence Report; 5) April 20, 2010 Sentencing Transcript.

## STATEMENT OF FACTS

**I.     INTRODUCTION**

This case has received much public attention not because of the crimes involved, but because of the celebrity status of the defendant's family.  While for many, this lineage would be a blessing, bringing with it wealth and privilege, for Cameron, it has been something less.  As he candidly admitted during his testimony against David Escalera, he squandered many opportunities that were given to him – and instead set on a path that led to his incarceration.

On April 20, 2010, this Court sentenced Cameron to 60 months imprisonment for his involvement in a drug conspiracy and for continuing to abuse drugs while he was released on bail. At that time, Your Honor stated that "we all need to get over the theme that Cameron Douglas is a victim." Sentencing Transcript, p. 11.  And that was surely true.  Stripped of the mitigating factors that the Court considered in imposing this sentence, Cameron had committed a serious offense with enormous social consequences.  Cameron Douglas is not a victim, but we also do not believe that he stands before this Court as a predator.  Rather, he is here again because he is still a drug addict in need of treatment, and like many drug addicts from every walk of life, Cameron Douglas succumbed once again to personal drug use.

On October 19, 2011, while an inmate at the Metropolitan Correctional Center ("MCC"), Cameron was found to possess .03 of a gram of Suboxone, a medication prescribed to treat heroin addiction and residue of white powder thought to be a narcotic.  Although matters of this sort are generally handled administratively by the BOP, Cameron also was charged judicially under 18 U.S.C. § 1791 to one count of possession of a prohibited object.  He pleaded guilty to this count the very next day.  This quick resolution and resort to separate criminal charges was likely due to Cameron's cooperation with the government and his anticipated testimony in United States v. Eduardo Escalara (09 Cr. 1082), scheduled at that time to begin on October 24, 2011.

2

Subsequent to his guilty plea, Cameron was punished severely by the BOP on two different charges – use of drugs and possession of drugs – based on the same set of facts. A Disciplinary Hearing Officer at the Metropolitan Detention Center ("MDC") has sanctioned Cameron over the course of two hearings to a total of 11 months in Disciplinary Segregation (23-hour lockdown), two years without any visitation from family or friends and the loss of 80 days of Good Time Credit. In addition, the length of Cameron's Disciplinary Segregation renders him ineligible for the BOP's Residential Drug Abuse Program ("RDAP") for an additional 11 months, further prolonging both the time until he can receive treatment and the length of his sentence.[2]

It has never been clearer that Cameron is in dire need of treatment for his severe drug addiction. He has been incarcerated since August 2009. With the exception of sessions with Dr. Robert Millman at the MCC, such treatment has been unavailable. According to experts, it is unsurprising that someone with Cameron's history of severe opioid dependence would relapse if given the opportunity. In fact, as discussed below, these experts agree that such behavior is almost expected. This is, of course, not to excuse the offense, but just to state the medical consensus. Indeed, as Dr. Millman said in his March 30, 2010 letter to this Court, he "fear[ed] the outcome of any scenario where Cameron is left untreated and surrounded by temptation for any significant period of time." Unfortunately, Cameron succumbed to the temptation before he was able to receive any treatment by the BOP.

## II. PERSONAL HISTORY

The particulars of Cameron's childhood and upbringing are laid out in great detail in the Sentencing Memorandum submitted to this Court on April 5, 2010. We summarize some salient points below.

---

[2] We note that the Defendant is challenging the severity of his BOP sanctions through the administrative appeals process. These appeals, however, are very rarely granted. Ex. 1 at 6.

Cameron was raised in both California and New York by his parents Michael and Diandra Douglas. As the Douglases will each admit, they had a troubled relationship and Cameron's upbringing left something to be desired. He was often neglected and left to fend for himself. He coped with this isolation by binge-eating as a form of self-medication.

Cameron was exposed to drug and alcohol abuse at an early age. His father struggled with a well-documented case of alcoholism. Moreover, both of his parents come from families where substance abuse was present. Dr. Millman stated in a previous letter to the Court that such exposure made drug use "acceptable" to Cameron.

At the age of 13, Cameron was sent away to boarding school against his will. Shortly thereafter, he learned of his parents' plans to divorce. Around the same time, Cameron began experimenting with drugs, specifically, marijuana. By the age of 15, Cameron had advanced to cocaine which he was using regularly, and eventually, intravenously. He did not graduate with his high school class and instead completed a high school proficiency test.

Cameron moved to New York at the age of 19 to pursue a career as a disc jockey. At the same time, he also pursued a career in film, working as a production-assistant on various projects and taking acting classes. Eventually, Cameron acted in a movie alongside his father and grandfather called "It Runs In the Family." Although Cameron's performance was well-received and other offers came his way, his film career stalled shortly thereafter due in large part to his extensive drug use.

Cameron was already a heavy user of cocaine and alcohol when he began shooting heroin at the age of 25. For Cameron, heroin removed the need to use any other drug. He began shooting-up regularly and was injecting himself five to six times a day at the time of his last arrest in July 2009.

4

### III.  POST ARREST

Immediately after his arrest, Cameron made the decision to cooperate proactively with the government. At that time, he was taken to the Downtown Hospital for medical clearance, diagnosed with opiate dependence and directed to take Suboxone which had been previously prescribed to him. Cameron also was told to see a doctor within the next two days. He was then brought to the MCC, where he was observed by the on-call psychologist to be "visibly high." At a later visit with the MCC psychologist, Cameron stated that he was concerned about "detoxing off heroin." It was recommended that if Cameron did not make bail, he should be put on a methadone protocol. The next day, Cameron was placed on house-arrest at his mother's home in Manhattan in order to facilitate his proactive cooperation. Documents related to these medical visits were included with the first sentencing memorandum.

On house-arrest, Cameron did not receive detoxification medication. He endured the agony of unassisted heroin withdrawal. Under those circumstances, Cameron asked his girlfriend to sneak heroin into the house for him. Dr. Millman stated in his January 26, 2010 letter to this Court that such behavior is "almost expected" from someone with Cameron's level of addiction.

Subsequently, Cameron's bail was revoked (on consent) and he was taken back to the MCC where he received methadone for heroin withdrawal. As will be described in greater detail below, Cameron continued to cooperate with the government from the MCC and attended numerous proffer sessions. During this time, counsel for Cameron submitted a bail application on his behalf in the hopes of having Cameron enter a rigorous drug addiction treatment program. All hearings involving Cameron's case have drawn extensive press attention, and the bail hearing was no different. In an unfortunate turn of events, Cameron's psychiatrist, Dr. Millman, inadvertently referred to Cameron as "an informant" in open court, confirming what had already been widely

5

speculated in the press. This led to the printing of numerous tabloid articles referring to Cameron's cooperation. See, e.g., *'Singing Role for Cameron'*, N.Y. POST, Feb. 12, 2010 ("The cat's out of the bag – actor Michael Douglas' son is a rat."). As a result, Cameron was placed in the Special Housing Unit ("SHU") for his own protection.

Over the course of his incarceration, Cameron was repeatedly placed in the SHU for reasons having nothing to do with his own conduct. This unit is generally reserved for inmates receiving punishment or who need to be kept separate for the protection of others. As described in the attached affidavit of Joel Sickler, a criminologist and former Probation officer, with over 30 years of experience working with the BOP, conditions in the SHU are quite harsh, even in comparison to the maximum security conditions of the MCC generally. Ex. 1 at 8.[3]

Cameron remained at the MCC until May 2010 when he was designated to the satellite prison camp at USP Lewisburg ("Lewisburg"). Leading up to his sentencing, Cameron experienced severe anxiety. ██████████████████████████████████████████ ████████████████████████████ At this time, stories about Cameron's sentencing were printed in the tabloid media on a regular basis and Cameron was again placed in the SHU for his own safety. See, e.g., *Kirk Douglas, Catherine Zeta-Jones Pen Letters in Hopes of Helping Cameron Douglas Skirt Jail*, N.Y. DAILY NEWS, April 4, 2010. ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ one of his former lawyers agreed to smuggle Xanax to him at the MCC.[4]

---

[3] A curriculum vitae for Mr. Sickler is attached to his affidavit at Ex. 1.
[4] ████████████████████████████████████

Up to that point, Cameron had received no formal drug addiction treatment aside from sessions with Dr. Millman.  Once he was designated to Lewisburg, all drug addiction treatment stopped.

## IV.    COOPERATION

Cameron agreed to cooperate with the government immediately after his arrest in July 2009.  This cooperation is described more specifically in the sentencing memorandum previously submitted.  The original intent was for Cameron to be a proactive cooperator, however, that became impossible after news of his arrest was leaked to the press.  Regardless, Cameron and Drug Enforcement Administration ("DEA") agents scrambled to make as many recorded phone calls and to send as many text messages as possible before Cameron's status was discovered.  He succeeded in placing numerous calls and texts to David Escalara and "Maestro."  These were the subject of much of Cameron's later testimony at the trial of David Escalara which resulted in a conviction.

For several months prior to his sentencing, Cameron met with the government and provided valuable information in a number of areas, including with respect to his suppliers, David and Eduardo Escalara.  As a result, the government filed a letter on his behalf pursuant to U.S.S.G. § 5K1.1.

In January 2011, Cameron was writted from Lewisburg to the MCC in order to testify against David and Eduardo Escalara.  In preparation, he met with the government on February 3, 2011.  Cameron experienced stress and anxiety in connection with his anticipated testimony against former friends and co-conspirators.  In addition, his planned testimony was widely reported in the press.  See, e.g., *Douglas Son Set to Sing*, N.Y. POST, Jan. 15, 2011 ("The feds are setting the stage for drug-dealing Hollywood scion Cameron Douglas to return to court and rat out his alleged

7

suppliers."). For various reasons not concerning Cameron, the trial was adjourned and he was sent back to Lewisburg knowing he would have to return to testify at a later date.

In September 2011, Cameron was again writted from Lewisburg to the MCC. Cameron met with the government on numerous occasions, working with new prosecutors and preparing for trial. He soon learned that he would be expected to testify in two separate trials, as David and Eduardo Escalara's trials had been severed. Cameron's arrival and news of his expected testimony was reported by the media, and again, Cameron experienced heightened anxiety. While at the MCC, Cameron was once more placed in the SHU due to media coverage about his testimony. See, e.g., *Cameron Douglas Named as Potential Government Witness in NYC Drug Trial*, N.Y. POST, Sept. 27, 2011.

On October 4 and October 5, 2011, Cameron testified against David Escalara who was convicted of conspiracy to distribute crystal methamphetamine. During the course of his two-day testimony, Cameron discussed in excruciating detail not only his drug dealing interactions with the Escalara brothers but also his own personal drug use. He was cross-examined thoroughly by defense counsel for Mr. Escalara, revealing many intimate details about his personal life, drug addiction and character. Again, all of this information was fodder for the world-wide tabloid press. See, e.g., *'Drugs in Bra'*, N.Y. POST, Oct. 5, 2011 ("Douglas – who looked like a scruffy and tattooed version of his dad – stammered and struggled with his drug-addled memory while detailing his behavior and squandered opportunities."); *Cameron Douglas Back in Court – as a Star Witness*, PEOPLE, Oct. 5, 2010.

## V.    OFFENSE CONDUCT AND PLEA AGREEMENT

In the wake of his first round of highly publicized testimony, with the second Escalera trial ahead, Cameron was found to have .03 of a gram of the prescription drug Suboxone in his cell at

the MCC.[5] He also was found with a small amount of white powder, initially believed to be cocaine, as represented in Cameron's Plea Agreement. A toxicology report and urinalysis provided by the government, however, show that the powder did not test positive for any drug and that Cameron's urine tested negative for cocaine (but positive for an opioid).

On October 20, 2010, within days of the discovery of this contraband, Cameron pleaded guilty before this Court to a one-count Information charging possession of a narcotic drug and a Schedule III controlled substance while an inmate in a federal prison in violation of 18 U.S.C. §§ 1791(b)(1) and (d)(1)(c), and 18 U.S.C. §§ 1791(b)(3) and (d)(1)(B), respectively. The Plea Agreement also reserved the right to revise the guidelines calculation therein based on the eventual outcome of laboratory results. See Plea Agreement at 2, n. 1.

## SENTENCING CONSIDERATIONS

## I.    RELEVANT STATUTORY PROVISIONS

Cameron pleaded guilty to violating 18 U.S.C. § 1791(a)(2). As defined in that statute, Cameron's possession of a narcotic drug in prison carries a maximum term of imprisonment of twenty years, a maximum term of supervised release of three years, and a maximum fine of $250,000. 18 U.S.C §§ 1791(b)(1) and (d)(1)(c). Any punishment imposed on an inmate under this section "shall be consecutive to the sentence being served" at the time the violation was committed. 18 U.S.C. § 1791(c).

It should be noted that the white powdery substance originally believed to be cocaine did not test positive for cocaine. The parties have reserved their rights pending the laboratory results.

---

[5] The Plea Agreement also states that Cameron possessed Suboxone from at least May 2011 through October 2011, while an inmate at both Lewisburg and the MCC. See Plea Agreement at 1.

## II.     SENTENCING GUIDELINES

In 2005, the Supreme Court modified the federal sentencing statute eliminating certain

provisions and rendering "the Guidelines effectively advisory." United States v. Booker, 543 U.S.

220, 245 (2005); see also United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[T]he

Guidelines are no longer mandatory."). For consistency and administration purposes, however, the

Guidelines serve as an "initial benchmark" and "a district court should begin all sentencing

proceedings by correctly calculating the applicable Guidelines range." Gall v. United States, 552

U.S. 38, 49 (2007). As explained in the Plea Agreement, the parties have stipulated that

Cameron's total base offense level is 13.

Cameron pleaded guilty before this Court on October 20, 2011, acknowledging his guilt

and expressing his deep regret. Cameron stated, "from May through October of 2011, [] while []

an inmate in federal custody I knowingly had in my possession Suboxone . . . . God knows I am

sorry." See Plea Hearing Transcript at 26. Cameron also plans to write the Court directly and

express his remorse in advance of his sentencing. In short, he has "clearly demonstrate[d]

acceptance of responsibility for his offense," and the government reduced his total Guidelines

offense level to 11. See Plea Agreement; see also U.S.S.G. § 3E1.1(a).

In accordance with the Plea Agreement, Cameron has six criminal history points. Cameron

had one criminal history point from a previous offense committed on or about September 23, 2005,

which resulted in three years of probation. See U.S.S.G. § 4A1.1 (c). He received three criminal

history points in relation to the five-year term of imprisonment imposed by this Court on April 20,

2010. See U.S.S.G. § 4A1.1(a). Lastly, he received two criminal history points for the current

offense, which was committed while in federal custody. See U.S.S.G. § 4A1.1(d). This places

him in Criminal History Category III. Taken together, Cameron's Guidelines range is 12 to 18

months. As was stated above, however, the Guidelines are only advisory. A court then has the "duty . . . to 'consider' them, along with the factors listed in [18 U.S.C. § 3553(a)]." Crosby, 397 F.3d at 111.

Pursuant to 18 U.S.C. § 3553(a) and the Plea Agreement, we respectfully request that the Court sentence Cameron below the stipulated Guidelines range.

## III.   SECTION 3553 FACTORS

The sentencing court is obligated "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in § 3553(a)(2)." Kimbrough v. United States, 552 U.S. 85, 111 (2007). In that endeavor, the court must consider not only the Guidelines, but also all of the factors identified in 18 U.S.C. § 3553(a). See Booker, 543 U.S. at 245; Crosby, 397 F.3d at 111. In this case, application of the section 3553(a) factors point clearly to a sentence below the guidelines range.

### A.   18 U.S.C. § 3553(a)(1): Nature and Circumstances of Offense; History and Characteristics of Defendant

The circumstances of the offense are set forth in detail in the Information, however, we note three mitigating factors. First, Cameron has received harsh punishment for this conduct by the BOP. Second, federal prosecutions of prisoners for these types of cases are rare, perhaps demonstrating the adequacy of BOP penalties. Third, this offense involved only a very small user quantity of drugs and the seizure of a fraction of one pill. Cameron is severely opioid deficient and in dire need of treatment for his drug addiction. A further extension of his incarceration (beyond the BOP sanctions) will not enhance his recovery.

It is typical for violations of this type to be dealt with directly by the BOP, and in fact, all drug misconduct charges within the BOP result in an administrative hearing. See Office of the Inspector General – Evaluation and Inspections Division, U.S. Department of Justice, The Federal

11

Bureau of Prison's Drug Interdiction Activities ["Drug Interdiction"] 3 (2003), *available at* www.justice.gov/oig/reports/BOP/e0302/final.pdf. Cameron's case is no different. Cameron had a hearing before a Disciplinary Hearing Officer at the MDC on two occasions regarding the very same offense conduct at issue here. His first hearing took place on October 27, 2011, and found that Cameron committed the prohibited act of Code 112, use of drugs. As a result, he was sanctioned to a 40-day loss of Good Time Credit, four months of Disciplinary Segregation, a one-year loss of family visits and commissary usage, and a two-year loss of all other ("social") visits, as well as a $250 fine. Ex. 2.[6] Cameron's second hearing took place on November 16, 2011, and found that Cameron also committed the prohibited act of Code 113, possession of drugs. For that charge, Cameron lost an additional 40 days of Good Time Credit and received an additional seven months of Disciplinary Segregation. Id.[7] The denial of family visitation privileges was extended by another year and social visits were denied for an additional two years. These consecutive sanctions mean Cameron will spend almost one year in solitary confinement and lose all visitation privileges for two years.

Not only was Cameron punished by the BOP, he was punished most severely. In fact, Mr. Sickler states that in his experience, "the length of disciplinary segregation imposed on Mr. Douglas (almost a full year of segregation) is typically reserved for the rarest of security circumstances." Ex. 1 at 10. Mr. Sickler goes on to say that he has never seen "such draconian sanctions by the BOP" for such an offense. Id. at 17. Ironically, these particular sanctions can arguably do more to derail rehabilitation of a drug-addicted offender like Cameron than to rehabilitate him. In fact, according to Dr. Carol Weiss, a drug addiction specialist engaged in part to assist in Cameron's BOP appeal, numerous studies show that family involvement has a positive

---

[6] This exhibit contains the relevant excerpts of the two DHO reports.
[7] Cameron was sanctioned on this second charge to a 10-day loss of Good Time Credit and a 30-day loss of Non-Vested Good Time Credit, for a total of 40 days.

12

effect on recovery from drug addiction for patients ███████████████████████████

Ex. 3 at 2-3.[8] ███████████████████████████████████████

████████████████████████████████████████

███████ Dr. Weiss states in her letter to the BOP that in her opinion, "the specific punishment of loss of family visits does more to undermine rather than enhance his rehabilitation and his ability to live as a productive citizen while in prison and after release" and the effect will only be compounded by Disciplinary Segregation. Id. at 2.

While sanctioning of drug violations in prison by the BOP are routine, federal prosecution of such cases are less common. A 2003 study by the Office of the Inspector General, the most recent study published on this issue, concluded that "the total number of drug misconduct charges for all BOP institutions *exceeds* 3,500 annually." Drug Interdiction, at 9-12 (emphasis added).[9] However, only a fraction of these cases are ever criminally prosecuted in federal court. In fact, during the four-year study period, the Federal Bureau of Investigation only opened 538 drug-related criminal cases against federal inmates -- or about 135 a year -- for violations of 18 U.S.C. §§ 3, 1791, and 1792. Id. at 13 and n.16. In sum, this means that under 4% of the 3,500 drug misconduct charges handled by the BOP receive additional investigation. Undoubtedly, a still smaller number result in prosecutions.[10]

---

[8] A curriculum vitae for Dr. Weiss is attached to her letter to this Court at Ex. 4.
[9] The BOP has four drug-related misconduct charges, all of which are classified in the most serious category as 100-level infractions: 1) Refusing to provide a urine sample or to take part in other drug abuse testing; 2) Introduction of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff; 3) Use of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff; and 4) Possession of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff. Drug Interdiction, at 9.
[10] Indeed, data from the Bureau of Justice Statistics for FY 2001 through 2009, shows that only 137 people, on average, were prosecuted each year for Section 1791 violations – an offense that covers a wide range of contraband, including weapons, by both inmates and non-inmates. Federal Justice Statistics Program, Bureau of Justice Statistics, http://bjs.ojp.usdoj.gov/fjsrc/ (last visited Dec. 1, 2011).

We also submit that Cameron's relapse into drug use, while a serious offense, was attributable in large part to his severe opioid deficiency built up after years of heavy heroin use and evidences his need to get into a drug treatment program as quickly as possible. As this Court is well aware, Cameron has been plagued by drug addiction for well over half his life. He has been a heroin addict since he was 25 years old with a habit that would be considered severe by any expert. Cameron injected himself with heroin five to six times a day. He suffered overdoses and has even been hospitalized as a result. The toll this extensive drug use has had on his body takes many forms. Notably, it has created a severe opioid dependence which requires medication and therapy like any other medical condition.

According to Dr. Weiss, Cameron's drug use causes what is called Opioid Protracted Abstinence Syndrome. Ex. 4 at 3. The syndrome, which affects "long term opioid users whose internal opioid synthesis and metabolism has been permanently damaged," is characterized by cravings, malaise, anxiety and depression. Id. Even drug-free, long term users like Cameron remain biologically opioid deficient for many years after they detox "in the same way an individual with an underactive thyroid gland is thyroid deficient without external thyroid hormone." Id. Cameron's seven-year dependency "is a classic example" of a long-term user who has damaged his body's ability to naturally produce opioids, and the "drive to correct this chemical deficiency" can last many years, creating a high risk of relapse. Id. In fact, this is the rationale behind opioid maintenance with drugs like Suboxone and Methadone. Id.

While a chemical imbalance is no excuse for Cameron's offense conduct, it does explain how he could succumb to drug use given the possible repercussions after a long period of sobriety. In fact, in his March 10, 2010 letter, Dr. Millman stated: "In order for Cameron to maintain his fragile sobriety, it is imperative that he receive comprehensive treatment immediately." He

14

warned that "drug use is quite prevalent in correctional institutions." Moreover, in his January 26, 2010 letter, Dr. Millman said, "Cameron's condition requires intensive and structured rehabilitation and a comprehensive regimen to learn relapse prevention techniques as well as other methods to decrease psychological symptomatology."

Cameron, on the verge of entering RDAP prior to this incident, understands the consequences of his actions quite acutely. In fact, during his testimony at the trial of David Escalera, Cameron agreed that he had the opportunity to do "almost anything," but he was "too immature, too reckless, whatever, and at some point those options were closed to [him]." D. Escalera Trial Tr. at 262. In light of such awareness, this relapse underscores his desperate need for treatment and the importance of getting him into a suitable program as quickly as possible.

### B. 18 U.S.C. § 3553(a)(2)(A)-(D): Punishment, Deterrence, Protection of the Public and the Need for Medical Attention

The second factor instructs the sentencing court to consider the need for sentencing to reflect the seriousness of the offense, to promote respect for the law, to deter criminal conduct, and to protect the public from future crimes by the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). In addition, and perhaps most notably, this section also requires the Court to consider a defendant's need for medical care in the most effective manner. 18 U.S.C. § 3553(a)(2)(D). Taking each of these in turn, we respectfully request that the Court grant Cameron a sentence below the Guidelines range, particularly based on his need for treatment pursuant to Section 3553(a)(2)(D) and submit that a sentence of time-served or probation, or a nominal term of imprisonment to satisfy 18 U.S.C. §1791(c) (requiring that any punishment be consecutive to the existing sentence), would be appropriate under the statute.

While Cameron does not dispute the seriousness of his transgression, a mistake for which he has taken full responsibility, we must nonetheless put it in context. Notably, the offense to

which Cameron pleaded guilty, 18 U.S.C. § 1791, only takes into consideration the *type* of contraband in question, and not the *quantity*. Cameron possessed a minute quantity of Suboxone, only .03 of a gram for personal use, a drug designed to wean heroin addicts from the harder drug (and which had actually previously been prescribed to Cameron for his addiction). Accordingly, punishment beyond that already meted out administratively would not be necessary to promote respect for the law or to protect other inmates. Surely, the motivation for Cameron's conduct does not come from a desire to thumb his nose at the law. On the contrary, Cameron hopes to receive treatment for his all-encompassing drug addiction so that he may lead a law-abiding life.

With respect to the deterrence of criminal conduct, Cameron already has received exceptionally severe punishment by the BOP, reflecting the seriousness of the offense. He will be in solitary confinement for practically an entire year. He will not be able to see his family and friends for at least two years. He has lost Good Time Credit, extending his sentence by 80 days. It cannot be said that his behavior has gone unpunished. But, the fact remains that Cameron is a drug addict who was exposed to available drugs. At this stage of his recovery, he did not have the tools or judgment to make the right decisions with regard to drug use. As Drs. Weiss and Millman make plain, for someone with Cameron's level of addiction, the risk of relapse is extremely high and lasts for several years. Ex. 4 at 3. Prolonging his stay, untreated, in facilities where drugs apparently can be obtained and a fair percentage of inmates are drug offenders will not serve the purpose of rehabilitating him to the point where he can lead a life that shows proper respect for the law and for his own wellbeing. A sentence of time-served or probation, on the other hand, will allow Cameron to get into treatment sooner, while continuing meaningful restrictions on his behavior.

Significantly, the present offense was not intended to harm the public in any way. In fact, the only person who was hurt here was Cameron himself. The drug quantity involved was a small, user-quantity. There was no intent to distribute drugs within the inmate population. This is simply a situation where a drug addict was able to acquire drugs for his own personal use. Therefore, there is no need to incarcerate Cameron further in order to protect the public. Further, the delay or denial of drug treatment will not protect the public in any way.

Lastly, this Circuit has long recognized the validity of variances from the Guidelines based on the need for medical treatment, including drug rehabilitation. See United States v. Maier, 975 F.2d 944, 945-47 (2d Cir. 1992); United States v. Williams, 65 F.3d 301, 302-03 (2d Cir. 1995). Notably, in Maier, the Second Circuit upheld the district court's decision to sentence a heroin addict to a four-year term of probation despite her guidelines range, 51 to 63 months, for distribution of heroin, even though the Pretrial Services Agency found she had engaged in unauthorized drug use more than half a dozen times since her arrest. Maier, 975 F.2d at 945-46. This decision was based in part on a report by the defendant's therapist stating:

> Such occurrences are the rule during recovery rather than the exception, and should not be cause for undue alarm. Narcotics addiction is a chronic form of pathology and recovery actually represents an attempt to militate against one's life history and psychological development. Recovery is experienced as an unending feeling of stress, an unnatural refusal to go along with the demands of body and mind. That the recovering addict might momentarily be unable to exert their nascent "good self" is not only easy to appreciate but equally witness to the initial fragility of the process.

Id. Maier's sentencing had been initially postponed for three months at her own request so that she could enter a residential drug treatment program and then for another year so she could continue to pursue rehabilitation including methadone maintenance. Id. at 945. At her eventual sentencing,

17

the district court found that if incarcerated, Maier would be unable to continue her maintenance program and, pursuant to its departure authority under Sections 3553(a)(1), (a)(2)(D) and (b), imposed a sentence of four years of probation during which time Maier would participate in a community drug treatment program. Id. at 946-47. The Second Circuit was satisfied that the sentencing judge had "conscientiously examined all of the pertinent circumstances" and upheld the sentence. Id. at 948.[11]



Additionally, such specialized treatment is hard to come by in the BOP. Thus, a sentence below the Guidelines range would facilitate his entrance into such treatment at the earliest possible time and in the most effective manner.

### C.  18 U.S.C. § 3553(a)(3): Kinds of Sentences Available

Section 3553(a)(3) requires the court to look at the kinds of sentences available. It is well-settled that "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Pope, 554 F.3d 240, 244 (2d Cir. 2009) (quoting United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008)). Here, the offense

---

[11] The Second Circuit makes clear that a factor in its sentencing determination was the defendant's demonstrated efforts toward rehabilitation. Maier, 975 F.2d at 949. This factor should not, however, weigh against Cameron who has had limited ability to demonstrate such efforts while incarcerated. Discussing Maier, the Second Circuit stated in Williams, "[s]ince 18 U.S.C. § 3553(a)(2)(D) requires the district court to consider the need for future medical or correctional treatment in devising a sentence, we see no reason to limit the power to grant departures for rehabilitative purposes to defendants who, by grace of a district court's delay in sentencing, have had an opportunity to develop a record of extraordinary past progress." Williams, 65 F.3d at 307.

in question is a Class C felony and therefore, probation as a sentence is available.  18 U.S.C. §§
3559(a)(3) and 3561(a).[12]

A sentence of probation with appropriate conditions designed to ensure Cameron's sobriety
and adherence to a strict treatment plan would be the most effective way to both rehabilitate him
and meet the section 3553(a) goals of sentencing.  "[T]rial courts traditionally have enjoyed broad
discretion to tailor the conditions of probation to the particular circumstances of each case,
provided that such conditions are reasonably related to the dual goals of rehabilitating the offender
and protecting the public."  United States v. A-Abras, Inc., 185 F.3d 26, 30 (2d Cir. 1996).  In
addition, "the courts and the United States Sentencing Commission have recognized that probation
is both rehabilitative and punitive."  United States v. Collado, No. 07 Cr. 1144 (HB), 2008 U.S.
Dist. LEXIS 44010, at *15 (S.D.N.Y. June 5, 2008).  Further:

> Probation is viewed by many as rehabilitative in nature . . .
> However, probation is also a punitive measure, and may be
> used as an alternative to incarceration, provided that the
> terms and conditions of probation can be fashioned so as to
> meet fully the statutory purposes of sentencing, including
> promoting respect for the law, providing just punishment
> for the offense, achieving general deterrence, and
> protecting the public from further crimes by the defendant.

Id. (quoting United States v. Brady, No. 02 Cr. 1043 (JG), 2004 U.S. Dist. LEXIS 589, at *8-9
(E.D.N.Y. Jan. 20, 2004) (quoting U.S. Sentencing Guidelines Manual ch. 5, pt. B, introductory
cmt.) (internal quotations omitted).

In addition to the explicit requirements that Cameron refrain from unlawfully using any
controlled substance and submit to periodic drug testing after his release, this Court has at its
disposal the discretionary conditions of probation listed in Section 3563(b).  18 U.S.C. §§ 3583(d)

---

[12] We note, however, that under 18 U.S.C. § 3624(e), Cameron's existing supervised release term may run
concurrently with any imposed term of probation; and accordingly, it may be appropriate to impose a nominal term of
imprisonment to satisfy the requirement under § 1791 that any "punishment" be consecutive to the defendant's
existing sentence.  The Court could also consider conditions of probation beyond the supervised release terms.

and 3563(b).  Notably, the Court may order that Cameron ███████████████████████████

███ treatment for drug dependency.  18 U.S.C. § 3563(b)(9).  Further, it is also within the Court's

power to include as a condition that revocation of probation would be mandatory if he is found to

possess a controlled substance.  See Maier, 975 F.2d at 946.  In light of Cameron's obvious need

and desire to undergo intensive drug rehabilitation, which will be required of him under the terms

of his already-imposed term of supervised release, we respectfully request that the Court sentence

him to probation so that he may do so at the earliest possible time.

### D.  18 U.S.C. § 3553(a)(6): The Need to Avoid Unwarranted Sentencing Disparities Among Similarly Situated Defendants

As noted, while many inmates are investigated for drug use in jail, there seem to be few

prosecutions.  The post arrest drug history of Cameron's co-conspirators who have also battled

drug addiction is instructive.  The point is not that these co-conspirators committed the same crime

of possessing drugs in jail, but rather that they suffer from the same affliction as Cameron.

Recovery from this affliction is difficult and relapse is common - even for those who are receiving

some treatment.

As the Court will recall from Cameron's trial testimony, he entered into negotiations to sell

a large quantity of narcotics to an individual he refers to as "the professor."  After receiving a

down payment, Cameron did not supply this individual with any drugs.  Our research reflects that

this individual was nonetheless arrested in May 2007 and prosecuted by the government for

possession with intent to distribute methamphetamine and conspiracy to do the same.  Indictment

07 Cr. 930 (RJH), docket entry October 3, 2007.[13]  He was released on bail, with terms including

strict pretrial supervision and drug testing.  In November 2007, while this individual was

---

[13] To protect the privacy of these defendants, who have completed their sentences, their names do not appear here.
They are known to the government.  The discussion here relies on PACER entries in cases 07 Cr. 930 (RJH) and 07
Cr. 990 (VM).

apparently pending sentence, he tested positive for drug use and was permitted to enter in-patient treatment. His bail was not revoked at that time. Unfortunately, the record reflects that this defendant suffered a second relapse in late January 2008, "specifically, regarding drug use," and with the consent of the government, the defendant was permitted to surrender for remand in February. See docket entry January 31, 2008. The record indicates this defendant remained in jail for a time, but was granted release again prior to sentencing. While a number of records in this case seem to be under seal, including the sentencing record, it appears that this defendant received time served (or approximately one year) for drug dealing and was not prosecuted at all for persistent drug use or for violating bail conditions while on pretrial release.

Another co-conspirator, Cameron's friend and former trainer, who introduced Cameron to his only regular buyer of crystal methamphetamine, also had a drug problem. He was arrested in July 2007 and, according to the docket entries, granted bail release requiring strict pretrial supervision, including testing and completion of an outpatient drug treatment program. Indictment 07 Cr. 990 (VM), docket entry July 26, 2007. He entered the program, but tested positive for methamphetamine while on bail release. On November 1, 2007, he was ordered detained with the consent of his attorney, however, he was granted bail again with the consent of the government prior to his sentencing in December 2010. He also received a sentence of time served for his involvement in a drug conspiracy, but was not prosecuted for using drugs himself or for violating the conditions of his bail.

In light of the above, we respectfully suggest that it would be fair and just, rather than disparate, to impose a sentence for this offense that would permit Cameron to get treatment at the earliest possible opportunity.

## CONCLUSION

For the foregoing reasons, we believe that nearly all of the Section 3553 factors argue strongly in favor of mitigation. Accordingly, we respectfully request that the Court not impose additional penalties for this offense, beyond those already imposed by the Bureau of Prisons. We further request that the Court recommend that the Bureau of Prisons reduce the period of Disciplinary Segregation imposed so that the defendant can participate in a BOP drug treatment program as soon as possible.

Respectfully submitted,

Nicholas M. De Feis (ND-1325)
Allison S. Menkes (AM-2246)
Vera M. Kachnowski (VK-0904)

DE FEIS O'CONNELL & ROSE, P.C.
500 Fifth Avenue, 26th Floor
New York, New York 10110
(212) 768-1000
*Counsel for Defendant Cameron Douglas*